Argued and submitted March 7, decision of the Court of Appeals affirmed; judgments of the circuit court reversed in part and otherwise affirmed, and case remanded to the circuit court June 20, 1996

Steven D. WALLULIS,
*Respondent on Review,*

*v.*

Tom DYMOWSKI
and Communications Workers of America,
Local 7901,
*Defendants-Respondents / Cross-Appellants.*

Tom DYMOWSKI,
*Third-Party Plaintiff-Cross-Appellant,*

*and*

COMMUNICATIONS WORKERS OF AMERICA,
Local 7901,
*Respondent on Review,*

*v.*

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,
a New York corporation,
*Petitioner on Review.*

(CC 9101-00424; CA A79806; SC S42604)

918 P2d 755

Jeffrey M. Batchelor, of Lane Powell Spears Lubersky, Portland, argued the cause and filed the petition for petitioner on review.

Kevin Keaney, of Pozzi Wilson Atchison, Portland, argued the cause and filed the brief for respondent on review Communications Workers of America, Local 7901.

Richard C. Busse, Portland, argued the cause for respondent on review Steven D. Wallulis. With him on the brief was Scott N. Hunt.

GRABER, J.

## GRABER, J.

In this case, we consider: (1) whether a defamatory statement concerning the work-related conduct of one employee, made by another employee of the same corporate employer to their mutual supervisor, may be actionable; and (2) whether, for the purposes of vicarious liability, an agent of a union simultaneously can be the agent of his or her employer. The Court of Appeals held that such a statement is actionable and that an agent of the union simultaneously can be the agent of the employer. *Wallulis v. Dymowski*, 134 Or App 219, 233, 895 P2d 315 (1995). We affirm the decision of the Court of Appeals.

The trial court granted defendants' motion for summary judgment, ORCP 47,[1] on plaintiff's defamation claims.[2] In that procedural context, this court views the evidence that was before the trial court on summary judgment, and all reasonable inferences to be drawn from it, in the light most favorable to the nonmoving party. *Fields v. Jantec, Inc.*, 317 Or 432, 437, 857 P2d 95 (1993).

In 1989, plaintiff, a supervisor with American Telephone and Telegraph Company (AT&T), began working at an AT&T facility in Beaverton. Defendant Dymowski was an employee of AT&T. Dymowski also was the union steward of the crew that plaintiff supervised and was a vice-president of Communications Workers of America, Local 7901 (CWA). CWA represented some of the employees at the Beaverton facility, including the crew that plaintiff supervised.

Plaintiff's supervisor at AT&T was Rick Potter. Potter's immediate supervisor was Bill Kastning.

---

[1] ORCP 47 B provides that a party against whom a claim is asserted may move for summary judgment. ORCP 47 D provides that, when a motion for summary judgment is made, the party adverse to that motion "must set forth specific facts showing that there is a genuine issue as to any material fact for trial."

[2] In his defamation claim, plaintiff alleged in part that Dymowski "published false and defamatory statements to Plaintiff's employer of and concerning Plaintiff." That claim contains no allegation about Dymowski's state of mind. In his separate "defamation with actual malice" claim, plaintiff incorporated by reference the gravamen of the defamation claim and also alleged that "Dymowski knew that allegations of substance abuse about Plaintiff were false, or acted in reckless disregard for the truth or falsity of those allegations."

A few months after plaintiff began working at the AT&T facility in Beaverton, Dymowski observed behavior that led him to believe that plaintiff abused alcohol. Dymowski noticed that plaintiff came to work late, was hard to contact during the day, and often looked as if he had a hangover. Also, other members of the work crew had complained to Dymowski about plaintiff's behavior.

Plaintiff and Dymowski did not have a congenial relationship. In February 1990, Dymowski filed a grievance against plaintiff. During that same month, Dymowski had an altercation with plaintiff concerning a matter unrelated to the grievance. Dymowski filed a second grievance against plaintiff. Management resolved both grievances.

Dymowski continued to receive complaints about plaintiff from members of plaintiff's crew. A crew member asked Dymowski to forward the crew's complaints about plaintiff's behavior to Potter. In addition, Booze, an employee whom plaintiff had supervised at another location, told Dymowski that plaintiff was a "substance abuser." Plaintiff presented evidence in the summary judgment record that he was *not* a substance or alcohol abuser.

In September 1990, AT&T required Dymowski to attend a two-day training seminar in Seattle. Potter and Kastning attended the seminar, too. Sometime during the seminar, Dymowski told Potter that he had been receiving complaints about plaintiff from members of plaintiff's crew. Dymowski told Potter that plaintiff was hard to contact during the work day and that plaintiff took long lunch hours or failed to show up at work until late in the afternoon. Dymowski also told Potter about his discussion with Booze, including Booze's assertion that plaintiff was a substance abuser.

Kastning was present during the conversation between Dymowski and Potter. Kastning overheard everything that Dymowski said to Potter.

After that conversation, Kastning and Potter questioned other crew members about plaintiff's work performance. In October 1990, AT&T removed plaintiff from his position at the Beaverton facility. AT&T offered plaintiff another position in California. Plaintiff did not accept that offer.

Plaintiff then brought this action against Dymowski and CWA, asserting claims for intentional interference with economic relations, defamation, and "defamation with actual malice." CWA brought a third-party action against AT&T for contribution and indemnity.

Dymowski and CWA moved for summary judgment against plaintiff. AT&T moved to dismiss CWA's third-party complaint for failure to state a claim, ORCP 21. The trial court granted both motions.

Plaintiff appealed, and CWA cross-appealed. The Court of Appeals held, as now pertinent, that the trial court erred when it dismissed plaintiff's claim against Dymowski and CWA for "defamation with actual malice" and that the trial court erred when it dismissed CWA's cross-complaint against AT&T for contribution. The court otherwise affirmed the judgment of the trial court. 134 Or App at 233.

AT&T petitioned this court for review, arguing that the trial court did not err when it granted Dymowski's and CWA's motion for summary judgment and AT&T's motion to dismiss. We allowed review.[3]

We begin our analysis with plaintiff's claim for "defamation with actual malice" because, if the summary judgment in defendants' favor as to that claim was proper, then we need not reach the issue of AT&T's contribution.

To establish a claim for defamation, a plaintiff must show, first, that the defendant made a defamatory statement

---

[3] The Court of Appeals also held that plaintiff's claims for defamation (in the absence of actual malice) and intentional interference with economic relations were preempted by the National Labor Relations Act, 29 USC § 151 *et seq*. 134 Or App at 227, 230. Accordingly, the Court of Appeals affirmed the trial court's grant of summary judgment as to those two claims. *Id.* at 233. Plaintiff did not seek review of those aspects of the Court of Appeals' decision, nor has plaintiff argued before this court that those holdings were erroneous. We do not consider those aspects of the Court of Appeals' decision on review.

In addition, the Court of Appeals held that CWA's third-party complaint for contribution and indemnity against AT&T failed to state a claim for indemnity. *Id.* at 232-33. Accordingly, the Court of Appeals affirmed the trial court's judgment dismissing CWA's claim for indemnity. CWA has not appealed that aspect of the Court of Appeals' decision, nor has CWA argued before this court that that holding was erroneous. We do not consider that aspect of the Court of Appeals' decision on review.

about the plaintiff. *Andreason v. Guard Publishing Co.*, 260 Or 308, 310-12, 489 P2d 944 (1971); *Farnsworth v. Hyde*, 266 Or 236, 238-39, 512 P2d 1003 (1973). Second, "[p]ublication or communication of the defamatory statement is an essential element of an action for defamation." *State ex rel Advanced Dictating v. Dale*, 269 Or 242, 247, 524 P2d 1404 (1974). In general, a statement is published when it is communicated to a third party. *See id.* at 246-47 (defamatory statement made over the telephone to a third party constituted publication); *see also Restatement (Second) of Torts*, § 577(1) (1977) ("[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed"); W. Page Keeton, ed, *Prosser and Keeton on the Law of Torts*, § 113, at 797 (5th ed 1984) ("[I]t is essential to tort liability * * * that the defamation be communicated to someone other than the person defamed. This element of communication is given the technical name of 'publication.' " (footnote omitted)). In other words, if a person makes a defamatory statement about another person, but that statement is not conveyed to a third party, no publication has occurred.

AT&T, CWA, and Dymowski argue that the statements made by Dymowski to Potter were not "published" and, therefore, are not actionable. Defendants assert that "a statement is not published when an employee speaks or otherwise communicates the statement to the employer's managers or supervisors and the statement solely concerns the work behavior of another employee." Defendants argue that that rule—dubbed in other jurisdictions the "intracorporate nonpublication rule"—"is consistent with the logic that corporations do not publish communications to themselves." They ask us to adopt that rule in this jurisdiction.

Plaintiff counters that the intracorporate nonpublication rule is rooted in an untenable legal fiction that a corporation is a single person for purposes of the tort of defamation. Plaintiff proposes instead that a "communication made by one agent to another agent of the same principal" is published.

This court never before has addressed the specific question whether a defamatory, work-related statement by

one corporate employee about another employee to those employees' supervisors is "published." *See Rice v. Comteck Mfg. of Oregon, Inc.*, 766 F Supp 1550, 1551 (D Or 1990) (noting that "there is no controlling Oregon case" addressing whether "statements made by one corporate employee during the performance of his duties within the hearing only of other corporate employees * * * constitute[s] publication" (internal quotation marks omitted)). Other jurisdictions have answered that question in different ways.

In some states, courts have adopted an intracorporate nonpublication rule. Those courts have concluded that, for the purpose of defamation law, agents of an employer cannot be considered third parties in relation to that employer. In *Prins v. Holland-North America Mortgage Co.*, 107 Wash 206, 181 P 680, 681 (1919), the Supreme Court of Washington explained the logic behind that rule:

> "Agents and employes of [the same principal] are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels. For the time being, they are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the acts of the corporation. For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself."

Nine states, including Washington, have adopted the intracorporate nonpublication rule. *See Dixon v. Economy Co.*, 477 So 2d 353, 354 (Ala 1985) (applying intracorporate nonpublication rule); *Williams v. Cook*, 192 Ga App 811, 386 SE2d 665, 666 (1989) (same); *Cangelosi v. Schwegmann Bros., Etc.*, 390 So 2d 196, 198 (La 1980) (same); *Lovelace v. Long John Silver's, Inc.*, 841 SW2d 682, 684 (Mo App 1992) (same); *Magnolia Petroleum Co. v. Davidson*, 194 Okla 115, 148 P2d 468, 471 (1944) (same); *Jones v. Golden Spike Corp.*, 97 Nev 24, 623 P2d 970, 971 (1981) (same); *Woods v. Helmi*, 758 SW2d 219, 223 (Tenn App 1988) (same); *Flynn v. Reinke*, 199 Wisc 124, 225 NW 742, 744 (1929). *See also Abrahams v. Young & Rubicam, Inc.*, 793 F Supp 404, 407 (D Conn 1992) (interpreting and applying Connecticut law and determining that

no intracorporate publication can occur). *But see Pirre v. Printing Developments, Inc.*, 468 F Supp 1028, 1041-42 (SDNY) ("[w]e do not believe that the courts of * * * Connecticut would" adopt that rule), *aff'd* 614 F2d 1290 (1979).

On the other hand, nine states have rejected the intracorporate nonpublication rule. *See Kelly v. General Telephone Company*, 136 Cal App 3d 278, 285, 186 Cal Rptr 184 (Cal App 1982) ("publication may involve internal corporate statements"); *Southern Bell Tel. & Tel. Co. v. Barnes*, 443 So 2d 1085, 1086 (Fla App 1984) (holding that "publication of [defamation] can occur in intra-corporation communications"); *Welch v. Chicago Tribune Company*, 34 Ill App 3d 1046, 340 NE2d 539, 544 (1975) (same); *Bals v. Verduzco*, 600 NE2d 1353, 1356 (Ind 1992) (describing that rule as "an unacceptable legal fiction"); *Lutterell v. United Telephone System*, 9 Kan App 2d 620, 683 P2d 1292, 1294 (1984) (same), *aff'd* 236 Kan 710, 695 P2d 1279 (1985); *Bander v. Metropolitan Life Ins. Co*, 313 Mass 337, 47 NE2d 595, 602 (1943) (same); *Bacon v. Michigan Cent. R. Co.*, 55 Mich 224, 21 NW 324, 326 (1884) (same); *Frankson v. Design Space Intern.*, 394 NW2d 140, 143-44 (Minn 1986) (same); *Kennedy v. James Buter, Inc.*, 245 NY 204, 156 NE 666, 667 (1927) (same). *See also Quinn v. Limited Exp., Inc.*, 715 F Supp 127, 128 (WD Pa 1989) (interpreting Pennsylvania law and determining that intracorporate communications were published but may be qualifiedly privileged); *Stewart v. Pantry, Inc.*, 715 F Supp 1361, 1367 (WD Ky 1988) (interpreting Kentucky law and determining that intracorporate communications were published but may be qualifiedly privileged); *Howcroft v. Mountain States Telephone and Telegraph Company*, 712 F Supp 1514, 1522-23 (D Utah 1989) ("the Court believes that Utah would follow the" rule that "there can be * * * 'publication' of communications between agents of the same corporation").

In *Lutterell*, the Court of Appeals of Kansas gave a representative explanation of the decision to reject the intracorporate nonpublication rule:

> "[I]t ignores the nature of the civil injury sought to be protected in a defamation action. Damage to one's reputation is the essence and gravamen of an action for defamation. It is reputation which is defamed, reputation which is injured,

reputation which is protected by the laws of libel and slander. Certainly, damage to one's reputation within a corporate community may be just as devastating as that effected by defamation spread to the outside. Thus, the injury caused by intracorporate defamation should not be disregarded simply because the corporation can be sued as an individual entity." 683 P2d at 1294 (citation omitted).

Commentators have not embraced the intracorporate nonpublication rule. For example, the American Law Institute has not endorsed that rule. The *Restatement (Second) of Torts* § 577, comment *i*, provides:

"The communication within the scope of his employment by one agent to another agent of the same principal is a publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation."

*See also* Keeton, *Prosser and Keeton on the Law of Torts,* § 113, at 798 ("There may be publication to any third person. It may be made to * * * the plaintiff's agent or employee. It may be made to the defendant's own agent, employee or officer, even where the defendant is a corporation." (footnotes omitted)). One author has written:

"The criticisms of this * * * no publication rule are well-reasoned, indeed, unanswerable. The intracorporate non-publication * * * rule ignores the fact that distinct personalities are involved within the corporate structure, that reputational damage therein 'may be just as devastating as that effected by defamation spread to the outsider,' and that the nonliability rule may open the door to serious abuse. Moreover, this view arbitrarily mandates differential treatment based on the adventitious choice of business associational form." David A. Elder, *Defamation: A Lawyer's Guide*, § 1:6[b], p 66 (1993) (footnotes omitted; some internal quotation marks omitted).

■ We are persuaded by the cited criticisms of the intracorporate nonpublication rule. The interest protected by the law of defamation is an *individual's* interest in his or her reputation, both in the community at large and in that individual's professional community. *See Adamson v. Bonesteele,* 295 Or 815, 821-22, 671 P2d 693 (1983) (stating that societal "concern for preservation of the interest in reputation and

fair name is reflected in the common law's long standing recognition of a right to recover damages from that person who invades that interest"); *see also Farnsworth*, 266 Or at 238 ("a person is defamed if his reputation is tarnished among * * * the community or * * * the defamed's associates"). The legal fiction created by the intracorporate nonpublication rule is inconsistent with the purpose for which the common law recognizes defamation claims. An individual's interest in maintaining a good reputation in the business community to which the individual belongs is not modified by the individual's relationship to the defamer. A defamatory statement made to one's employer can harm one's business reputation with the employer, whether the defamer is a coworker or is instead removed from the employment relationship.[4]

■       In summary, we reject defendants' argument that this court should adopt the intracorporate nonpublication rule. Instead, we hold that a defamatory communication from one corporate employee to another corporate employee concerning the job performance of a third employee is "published" for the purpose of a defamation claim.

Our conclusion that Dymowski's statements were published does not end our inquiry in this case, however. We still must determine whether those statements are (or may be) "privileged" and, if so, to what extent.

■       There are two forms of privilege that may apply in a defamation action; a defamatory statement may be either "absolutely privileged" or "qualifiedly privileged."[5] An "absolute privilege" bars a claim for defamation. *See Moore v. West*

---

[4] *Compare McGanty v. Staudenraus*, 321 Or 532, 535-43, 901 P2d 841 (1995). In that case this court held, as pertinent, that an employee acting in the course and scope of employment is not a third party to a contract between the employer and another employee for the purpose of the tort of intentional interference with economic relations. *Id.* at 543. In *McGanty*, the court began by looking to the interest protected by the tort of intentional interference with economic relations. "The tort serves as a means of protecting contracting parties against interference in their contracts from *outside* parties." *Id.* at 536 (emphasis in original). The court held that, for the purposes of that tort, an employee acting in the course of employment could not be an "outside party" invading that protected interest.

Each tort must be considered on its own terms. The interest protected by a defamation claim does not hinge on that party's economic relationship with the defamer.

[5] In some cases, the term "conditional privilege" is used, while in others the term "qualified privilege" is used. In this context those terms have the same meaning. In this opinion, we use "qualified privilege."

*Lawn Mem'l Park*, 266 Or 244, 249, 512 P2d 1344 (1973) ("[w]hen defamatory matter is absolutely privileged no cause of action exists"). By contrast, a "qualified privilege" "does not bar the action, but requires [the] plaintiff to prove that the defendant" abused the privileged occasion, in order to recover from the defendant. *Bank of Oregon v. Independent News*, 298 Or 434, 437, 693 P2d 35, *cert den* 474 US 826 (1985).

This court previously has stated that "the question of whether or not a defamatory statement is privileged, either absolutely or conditionally, depends upon the balance that the court strikes between competing interests." *Lee v. Paulsen*, 273 Or 103, 105, 539 P2d 1079 (1975). Heretofore Oregon has recognized only a handful of situations in which defamatory statements are absolutely privileged. *See Grubb v. Johnson et al*, 205 Or 624, 631, 289 P2d 1067 (1955) ("[t]he class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of state" (internal quotation marks omitted)).

■ First, statements that are made as part of judicial and quasi-judicial proceedings are absolutely privileged. *See, e.g., Ducosin v. Mott*, 292 Or 764, 768, 770, 642 P2d 1168 (1982) (communications to a medical examiner suggesting a possible homicide should be "cloaked with an absolute privilege," because those communications are "an initial step in a judicial proceeding" (internal quotation marks omitted)); *Binder v. Oregon Bank*, 284 Or 89, 91, 585 P2d 655 (1978) ("[s]tatements made by parties to judicial proceedings are absolutely privileged"); *Moore*, 266 Or at 250-51 (communications made to State Board of Funeral Directors and Embalmers, when that Board is sitting in its quasi-judicial function as a licensing body, are absolutely privileged); *Ramstead v. Morgan*, 219 Or 383, 401, 347 P2d 594 (1959) (absolute privilege attached to former client's statements to a State Bar committee concerning alleged attorney misconduct, because Bar committee was serving a judicial or quasi-judicial function). Similarly, statements made as part of a legislator's legislative duties are absolutely privileged. *See, e.g., Noble v. Ternyik*, 273 Or 39, 41-45, 539 P2d 658 (1975) (recognizing an absolute privilege for state legislators and members of "lesser legislative bodies" for "statements, made in the course of their legislative duties").

In addition, this court has held that "there is an absolute privilege for publications that are consented to." *Lee*, 273 Or at 105. That rule applies even when the allegedly defamed person did not consent to the exact words that are published, as long as the person "had reason to believe the [consented to] publication would be defamatory." *Christensen v. Marvin*, 273 Or 97, 102, 539 P2d 1082 (1975). In *Lee*, the court explained:

> "The reason for the imposition of the privilege when the plaintiff consents or requests the publication is based upon the unwillingness of the courts to let the plaintiff lay the foundation of a lawsuit for his own pecuniary gain." 273 Or at 106 (citations omitted; internal quotation marks omitted).

*Christensen* suggested that a third situation gives rise to an absolute privilege—when statements are made to carry out a statutory requirement. *See* 273 Or at 100 ("We are further influenced in this particular case to [hold that the alleged defamatory statements are absolutely privileged] because the defendant board members published the reasons for their failure to rehire the plaintiff because they were required to by statute.").

In the first kind of situation—when statements are made as part of judicial, quasi-judicial, or legislative proceedings—this court has concluded that the public's interest in the unhampered operation of the government, when exercising such functions, outweighs an individual's interest in the preservation of reputation. In the second kind of situation—when the plaintiff has consented to the publication—this court has found that the judicial branch of government has an interest in preventing parties from manipulating the legal system for their own gain by consenting to, but then suing on, a particular defamatory statement. That interest, too, stems from a need to preserve the integrity of the judicial function and, likewise, outweighs individuals' reputational interests. The third kind of situation—when statements are required by statute—similarly relies on the interest in facilitating the operation of law.

Defamatory statements made by employees in the private sector to other employees in the private sector are

unrelated to a judicial, quasi-judicial, or legislative function. Nor do the statements made here arise from plaintiff's consent or fulfill a statutory requirement. The alleged defamatory statements in this case do not fall within the classes of absolutely privileged statements previously recognized by this court.

■ Moreover, we are not convinced that there is a policy justification for extending an absolute privilege to the present situation. On the one hand, employees and their private employers have a legitimate interest in free communications on work-related matters, especially when reporting actual or suspected wrongdoing. On the other hand, an absolute privilege would immunize a falsehood designed to harm the object of a disgruntled employee's wrath. When we balance the competing interests, we believe that a qualified privilege adequately protects the kinds of interests involved.

As we have stated above, a qualified privilege, unlike an absolute privilege, does not bar a defamation claim. In *Wattenburg v. United Medical Lab.*, 269 Or 377, 380, 525 P2d 113 (1974), this court explained when a statement is qualifiedly privileged:

> "A statement is conditionally privileged if: (1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made." (Citing *Restatement of Torts*, §§ 594-96 (1938).)[6]

*See also Walsh v. Consolidated Freightways*, 278 Or 347, 355, 563 P2d 1205 (1977) ("a former employer has a qualified privilege to make defamatory communications about the character or conduct of his employees to present or prospective employers").

A defamatory work-related statement made by an employee to that employee's supervisor concerning another employee's work performance falls into either the second or

---

[6] In *Wattenburg*, the court adopted the concept of "conditional privilege" as embraced in the *Restatement of Torts*. After *Wattenburg* was decided, the pertinent sections of the *Restatement (Second) of Torts* concerning defamation were published. Except for a few changes in wording and grammar, *Restatement (Second) of Torts*, §§ 594-96 (1977), are identical to *Restatement of Torts*, §§ 594-96 (1938).

third category delineated by the court in *Wattenburg*. Such a statement could be made to protect the interests of the employer, or it could be on a subject—such as workplace harmony—of mutual concern to the defamer and the supervisor to whom the statement was made.

■ As noted, this case comes to us on review of a summary judgment. Although the record on summary judgment is sufficient to establish that defendant Dymowski published a defamatory statement about plaintiff to supervisors Potter and Kastning, there remain genuine issues of material fact, ORCP 47 C, for example, as to whether defendant Dymowski lost the qualified privilege by abusing the privileged occasion.[7] Accordingly, the trial court erred when it granted defendants' motion for summary judgment on plaintiff's claim for "defamation with actual malice."

■ We next address the issue of contribution. The trial court granted AT&T's motion to dismiss CWA's contribution claim for failure to state a claim.[8] The Court of Appeals

---

[7] Genuine issues of material fact arise from two types of evidence that plaintiff presented in the summary judgment record.

First, plaintiff presented evidence that Dymowski was extremely angry with plaintiff over a work-related disagreement in which plaintiff told Dymowski that he had failed to follow company procedure in connection with an expense voucher. Dymowski became enraged, using obscenities and telling others that he would "tear [plaintiff's] head right off his shoulders." Dymowski also told a member of the crew that he would "get" plaintiff. *See Wattenburg*, 269 Or at 380 (to overcome a qualified privilege, "[t]he plaintiff must offer evidence of some kind of improper motive on defendant's part").

Second, plaintiff presented evidence that Dymowski's personal observations had led him to believe that plaintiff had only a *drinking* problem. However, Dymowski reported to the supervisors Booze's statement that plaintiff had a *substance abuse* problem, without verifying the accuracy of that statement. It would be permissible to infer from his belief that plaintiff had only a drinking problem that Dymowski acted recklessly when he reported Booze's statement as to a substance abuse problem. The distinction may matter, because a substance abuse problem may imply illicit drug use, whereas alcohol abuse does not. *See Marr et al. v. Putnam et al.*, 196 Or 1, 34-35, 246 P2d 509 (1952) (reckless publication of a statement that a person has committed a crime overcomes qualified privilege); *Walsh*, 278 Or at 356-57 ("[e]vidence that [the defamer] did not believe the statements he made about the plaintiff would tend to show that the privilege was abused").

[8] In reviewing a trial court's grant of a motion to dismiss, we assume the truth of all well-pleaded facts alleged in the complaint and give the nonmoving party the benefit of all favorable inferences that may be drawn from those facts. *Stringer v. Car Data Systems, Inc.*, 314 Or 576, 584, 841 P2d 1183 (1992).

reversed, concluding that both AT&T and CWA could be liable for Dymowski's alleged defamatory statements about plaintiff, "because an agent may simultaneously serve two principals." 134 Or App at 232.

AT&T asserts that the Court of Appeals erred, because "it did not take into account federal labor law in general, and the [National Labor Relations Act] in particular." AT&T argues that, under the National Labor Relations Act (NLRA), the following rule applies: "Where * * * the ostensible agent is a union vice-president and shop steward and the two ostensible principals are a union and an employer engaged in a labor dispute, *that* agent can serve but one principal—the union." (Emphasis in original.)

AT&T's argument is premised on the assumption that, when Dymowski made the alleged defamatory statements to Potter, CWA was engaged in a "labor dispute" with AT&T. Under the NLRA:

> "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 29 USC § 152(9).

From the assumption that there was a labor dispute, AT&T reasons that, "[u]nder the plain terms of the NLRA," Dymowski, "as union vice-president and shop steward, had to have been working for CWA and its members exclusively."

We need not address whether CWA's third-party complaint pleaded facts to establish that a "labor dispute" existed between AT&T and CWA when Dymowski allegedly made the defamatory statements at issue in this case. AT&T's argument fails even if a labor dispute between the parties existed at that time.

AT&T bases its conclusion—that Dymowski was working exclusively for CWA when he made the alleged defamatory statements—on its reading of the definition of "employer" contained in the NLRA. Under the NLRA, an "employer" is defined as

"any person acting as an agent of an employer, directly or indirectly, but shall not include * * * any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." 29 USC § 152(2).

From that definition, AT&T concludes that a union's agent cannot also be an employer's agent. In effect, AT&T argues that the NLRA prevents a person who is both a corporate employee and a union member from acting simultaneously as the agent of the union and the agent of the employer. The United States Supreme Court recently rejected a substantially similar argument in *NLRB v. Town & Country Electric, Inc.*, 516 US ____ , 116 S Ct 450, 133 L Ed 2d 371 (1995).

In *Town & Country*, the Supreme Court held that a worker may be a company's employee, within the terms of the NLRA, even if, at the same time, a union pays that worker to help the union organize employees of the company. 133 L Ed 2d at 382. In that case, members of a union applied for work with a nonunion electrical contractor. Those union members intended to try to organize other employees at the company, if they were hired, and would have been paid by the union while they set about doing so. The company refused to hire them because of their union membership. The company argued that the union members could not be deemed protected employees under the NLRA because, when they applied for the jobs with the company, they were employees of the union. *Id.* at 375. The National Labor Relations Board (NLRB) rejected the company's reading of the statute and held that the union members' employment with the union did not preclude them from being protected employees in relation to the company under the NLRA. *Ibid.* The Supreme Court held that the NLRB had "lawfully interpret[ed]" the statute. *Id.* at 376.

In *Town & Country*, the Court explicitly rejected the argument that "the common law of agency" required an interpretation of "employee" that excluded paid union organizers. That "argument fails, quite simply, because, in our view * * * it lacks sufficient support in common law." *Id.* at 379-80. The Court went on to explain:

"Common sense suggests that as a worker goes about his *ordinary* tasks during a working day, say, wiring sockets or laying cable, he or she *is* subject to the control of the company employer, whether or not the union also pays the worker. The company, the worker, the union, all would expect that to be so. And, that being so, that union and company interests or control might *sometimes* differ should make no difference." *Id.* at 380 (emphasis in original).

The situation presented in this case raises similar issues. In *Town & Country*, the union members were serving the interests of their union when they applied for employment with the company. Even though the union members were acting on behalf of the union when they applied for work (and thus were agents of the union), they also were acting as "employees" for the company. Neither the NLRA nor the common law of agency precluded dual agency.

In this case, Dymowski's alleged comments to Potter concerning plaintiff's work-related behavior could be viewed as statements concerning "work conditions," giving rise to a "labor dispute." Dymowski made those statements to management at the request of his coworkers who were members of CWA and in his capacity as a union steward. Thus, he made those statements as an agent of CWA. CWA alleged, however, that Dymowski made those statements at the behest of his superiors while in the course and scope of his employment with AT&T; thus, CWA alleged facts that would be sufficient to establish that Dymowski also was acting as AT&T's agent when he made the defamatory statements. When Dymowski spoke with Potter, he may have done so as an agent of both CWA and AT&T.

Under federal law, a union member may serve simultaneously as an agent of both a union and an employer. That is, a communication can serve two purposes, and an agent can serve two principals. The law of this jurisdiction is to the same effect. *See Blair v. United Finance Co.*, 228 Or 632, 635, 365 P2d 1077 (1961) ("[a]n agent can work for more than one principal").

AT&T also argues that—regardless of *Town & Country* and common law principles of agency—if Dymowski is treated as being both AT&T's and CWA's agent, Dymowski

and AT&T would have colluded improperly against the interests of CWA and its members, in violation of the NLRA. AT&T reasons that "employers and unions" must be "on opposite sides of any labor dispute." That, according to AT&T, precludes the simultaneous, dual agency that CWA alleges in this case.

In support of that argument, AT&T points to two sections of the NLRA. The NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their organizing rights. 29 USC § 158(a)(1). *See Garment Workers v. Quality Mfg. Co.*, 420 US 276, 280, 95 S Ct 972, 43 L Ed 2d 189 (1975) (it is an unfair labor practice for an employer to discipline a shop steward for attempting to present a union grievance). It also is an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization." 29 USC § 158(a)(2); *see Labor Board v. Newport News Co.*, 308 US 241, 249, 60 S Ct 203, 84 L Ed 219 (1939) (it is an unfair labor practice for an employer to control an employee organization).

As an abstract proposition, we agree with AT&T that an employer's collusion with or domination of a union and its members would constitute an unfair labor practice in violation of the NLRA. However, that possibility simply does not arise under the particular facts alleged by CWA in this case. AT&T's interest in learning about plaintiff's job performance, and Dymowski's interest as a shop steward in reporting his observations about plaintiff's job performance, present no clash of employer/employee interests within the meaning of the cited statutes. Therefore, we find AT&T's argument unpersuasive.

The decision of the Court of Appeals is affirmed. The summary judgment of the circuit court for defendants Dymowski and CWA on plaintiff's claim for defamation with actual malice is reversed. The judgment of the circuit court dismissing CWA's claim against AT&T for contribution is reversed. The judgment is otherwise affirmed, and the case is remanded to the circuit court.