Susan E. MORLAN, Plaintiff,

v.

QWEST DEX, INC., a Colorado corporation, Defendant.

Civil No. 03–1406–MO.

United States District Court, D. Oregon.

Aug. 25, 2004.

Richard C. Busse, Busse & Hunt, Portland, OR, for Plaintiff.

Christopher L. Garrett, Perkins Coie, LLP, David P.R. Symes, Perkins Coie, LLP, Portland, OR, for Defendant.

## ORDER and OPINION

MOSMAN, District Judge.

In this diversity action, the issue is whether statements by company officials about plaintiff, a former employee of the company, supports a claim for defamation. Because the company's defense of privilege carries the day, the court grants summary judgment in the company's favor. (Doc. # 17).

## I. BACKGROUND

The facts, construed in favor of the non-movant plaintiff, are as follows. Defendant Qwest Dex, Inc. ("Dex") employed plaintiff Susan Morlan as a Portland-based

director of advertising sales and general manager for Dex's "yellow pages" phone directories. Plaintiff managed the sales organization responsible for selling advertisements to customers located in Oregon and southwest Washington.

In November 2002, Dex CEO George Burnett received an anonymous phone call, purportedly from a former employee, complaining about plaintiff's management of the Portland sales organization. The caller specifically mentioned plaintiff's refusal to allow employees to remove advertisements from the Portland-area directory. The caller also complained about plaintiff's management style and alleged drinking problem. The caller further told Burnett that Dex would begin losing sales personnel unless he fired plaintiff. In response, Burnett ordered a formal investigation of plaintiff's management of the sales team.

Jill Groves, a member of Dex's security department, conducted the investigation. Groves had no personal knowledge or experience with Dex's credit policies and procedures. Therefore, she sought guidance from Jim Dodson, manager of Dex's credit management organization ("CMO"). CMO's function is to review credit applications to ensure the sales team sells advertising only to creditworthy customers and that the directory includes no "bad debt" advertisements (*i.e.*, advertisements for customers delinquent on their bills). Generally, when an account is delinquent, CMO sends a "notifier" informing the responsible sales team about the account.

Based on information provided by Dodson, Groves discovered about $1.5 million worth of bad-debt advertisements published in the 2002 Portland-area directory. The total number of delinquent accounts was 245, which included 141 accounts worth $500,000 that had been referred to collection agencies.

From July 23 to July 26, 2002, in anticipation of the 2002 directory to be publish-

ed in September, CMO sent a "blitz" of about 500 email notifiers reminding Portland sales representatives about various bad-debt accounts and instructing them either to make proper payment arrangements or remove the accounts from the upcoming directory. CMO did another "blitz" in September, days before the new directory was to be sent to the printer.

Dodson testified at his deposition he commonly used blitzes of notifiers as a way to inform sales personnel about problematic accounts, although Portland-area sales personnel found the July blitz unusual for the volume of notifiers involved. Dodson further testified he expected sales personnel to remove advertisements upon receipt of the notifiers. But he could not cite any policy supporting that expectation.

At some point before publication of the 2002 directory, Dodson or his boss, Tony Basile, expressed frustration to Gary Gibson, Dex's director of sales operations, about a specific account handled by plaintiff's sales team. The account at issue was a $10,000 per month account for a company called "Action Locksmith." Dex argues Action Locksmith's credit application was certain to fail but plaintiff nevertheless told her sales team to keep the company's advertisements in the directory. Art Townsend, the Action Locksmith account manager, testified that plaintiff instructed him to ignore calls from CMO regarding the account. Plaintiff herself also ignored repeated calls and emails regarding that account. Eventually, Gibson himself had to remove the Action Locksmith advertisement days before the directory was to go to the printer.

Groves's report described this incident involving Action Locksmith. The report also recounted other incidents employees had described to Groves. For example, a sales manager told Groves that plaintiff instructed the manager to leave a Vancou-

ver, Washington customer's advertisements in the 2002 directory even though plaintiff knew CMO had denied a credit application submitted by the customer. Another sales manager asked plaintiff about removing advertisements for a customer who owed overdue payments; plaintiff told the manager not to remove the advertisements because the customer planned to sell his boat to pay the overdue balance. Other Dex employees testified regarding plaintiff's decisions to keep advertisements in the directory for delinquent customers. See, e.g., Depo. of O'Connor at 16 (testifying plaintiff told personnel not to remove bad-debt advertisements); Depo. of Mitchell at 9 (testifying plaintiff instructed managers to "leave the advertising in," despite CMO notifiers, because otherwise there was not "a lot of negotiating power with CMO"). Based on the employee interviews, Groves discovered that plaintiff's sales team felt "between a rock and a hard place" in that CMO told the team one thing, while plaintiff's "wrath" awaited team members who listened to CMO.

David Quinn, a Dex sales-staff manager, testified that plaintiff's approach to bad-debt advertisements reflected her desire to circumvent Dex's credit policy. Pursuant to that company policy, for new advertisers whose accounts would exceed a certain dollar amount, CMO had to approve their credit applications *before* their advertisements were placed in a directory. In contrast to that policy, Quinn testified plaintiff wanted sales personnel to put the advertisements in the directory first so CMO would be less likely to take action.

Pursuant to the practice followed by sales personnel, as described by plaintiff, upon receipt of a CMO notifier, the account's sales representative would first attempt to collect the outstanding account. Then, if that failed, the account's sales manager would attempt collection. If the sales manager was unsuccessful, sales personnel would hire independent-contractor collection agencies to pursue the account. Finally, if those efforts failed, the responsible sales representative generally was expected to pull the delinquent customer's advertisements from the directory. Consistent with this sales-department policy, plaintiff told sales personnel they should not remove advertisements unless all collection efforts first had been exhausted.

The record shows there generally was an ongoing conflict between CMO and sales personnel including plaintiff. As one witness put it, CMO and sales were "rowing the boat in different directions." Dodson, for instance, testified that the Portland sales department's practice of hiring independent contractors to collect bad debts had "been kind of a thorn in [his] side for some time." According to Dodson: "the problem with the contractors [is] they often confuse the issue; they would interfere with payment arrangements or demands that [his CMO] team had already had in place." Thus, Dodson agreed, CMO personnel sometimes felt that the independent contractors effectively "undercut" CMO's authority.

Dodson told his boss at CMO, Mr. Basile, he believed plaintiff failed to remove bad-debt advertisements in order to inflate her sales team's revenue. Dodson and Basile both told another Dex manager, Gary Gibson, that they believed plaintiff had artificially inflated her sales team's revenue by about $1.3 million. Gibson, in turn, conveyed this information to plaintiff's supervisor, Ms. Shaw. The allegation plaintiff was improperly inflating revenue found its way into Groves's report.

Ms. Groves interviewed plaintiff just once, on November 18, 2002. Groves asked plaintiff about fifty-eight specific delinquent accounts, but would not allow plaintiff to take the list of the accounts at

issue so plaintiff could formulate a response. Groves testified she could not articulate a reason for why she did not allow plaintiff to take the list.

Eventually, Shaw held a conference call with Groves and a Dex attorney to discuss the bad debts. At the conclusion of the call, Shaw decided to terminate plaintiff's employment in light of her violation of CMO policy and Dex's Code of Conduct provision requiring employees to maintain accurate books and records. In a December 10, 2002, meeting, Shaw informed plaintiff of the decision to terminate her.

A short time later, plaintiff filed an administrative complaint with the United States Department of Labor, alleging she had been terminated because of her association with colleagues who allegedly were "whistleblowers" within the scope of the Sarbanes–Oxley Act (an issue not before this court). In defending Dex's termination of plaintiff, a company attorney, David Elchoness, explained to the department the company fired plaintiff because of her decisions regarding bad-debt advertisements. The Department dismissed plaintiff's complaint.

Plaintiff filed this lawsuit on September 8, 2003, alleging state law claims for defamation, wrongful termination, and retaliation. Plaintiff concedes summary judgment is appropriate as to her wrongful-termination and retaliation claims. The court, therefore, grants summary judgment as to those two claims. The only remaining dispute is whether summary judgment should be granted as to plaintiff's defamation claim.

## II. DISCUSSION

In support of her defamation claim, plaintiff's briefing relies on statements which, she alleges, defamed her by suggesting she allowed "bad debt" advertisements to remain in the directories in an improper effort to inflate her sales team's revenue. Because meaningfully assessing a defamation claim calls for a statement-specific inquiry, it is important, as a threshold matter, to determine precisely what statements plaintiff alleges defamed her. While plaintiff does not clearly set forth the statements upon which she relies, her briefing mentions the following statements and inferences:

- Dodson told his boss at CMO, Mr. Basile, he believed plaintiff had intentionally failed to remove bad-debt advertisements to inflate her revenue.

- Both Basile and Dodson told Gibson (Dex's sales-staff director) that plaintiff had inflated her revenue by $1.3 million.

- Basile told Gibson and Ms. Shaw (plaintiff's boss) that he believed plaintiff had intentionally failed to remove bad-debt advertisements.

- Although plaintiff does not identify specifically the content of any statements made by Gibson, plaintiff's arguments imply Gibson made statements conveying the same message as that conveyed by Basile and Dodson.

- Groves, in her written report, stated the following: "Allegedly, Ms. Morlan allowed 162 bad-debt customers to remain in the Portland directory in order to inflate her sales results by $1.3 million." This statement was derived from statements by Groves's boss, Susan Demmin.

- In a November 20, 2002, draft of her report, Groves stated plaintiff might have violated Dex's code of business ethics by "[i]nflating revenue by allowing bad debt accounts to remain in the 2002 Portland book."

- Plaintiff also argues that Shaw's notes support the inference Groves made additional statements during a meeting with Shaw; while plaintiff does not identify any specific statements, she

suggests the statements also charged plaintiff with improperly failing to remove bad-debt advertisements.

- In response to the Department of Labor's investigation of plaintiff's complaint, Dex attorney David Elchoness wrote a letter stating: "[T]here are numerous examples of employees who, like Ms. Morlan, were terminated from their employment based on their enhancement of data and falsification of Company documents."

For the reasons discussed below, the court concludes no statement specifically identified or presumed by plaintiff to have been made supports a defamation claim in this case.

 To establish a claim for defamation, a plaintiff generally must show harm resulting from defendant's publication to a third party of a defamatory, false statement of and concerning the plaintiff. *Wallulis v. Dymowski*, 323 Or. 337, 342–43, 918 P.2d 755 (1996); Restatement (Second) of Torts § 558. Even if a plaintiff can satisfy the basic elements of a defamation claim, however, a statement nevertheless is not actionable if it was privileged. In certain narrowly defined cases, statements are absolutely privileged, including when they were made in the course of "quasi-judicial" administrative proceedings. See, e.g., *Tillamook Country Smoker, Inc. v. Woods*, 732 F.Supp. 1091, 1093–94 (D.Or. 1990); *Moore v. West Lawn Mem'l Park, Inc.*, 266 Or. 244, 250–51, 512 P.2d 1344 (1973). More often, a defendant will argue that otherwise actionable statements qualify for a conditional (or, stated differently, qualified) privilege. A statement qualifies for a conditional privilege if:

(1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the person to whom the statement was made.

*Wattenburg v. United Med. Labs., Inc.*, 269 Or. 377, 380, 525 P.2d 113 (1974). Under Oregon law, even when statements otherwise are conditionally privileged, plaintiffs can pierce the privilege by showing the privilege was abused. *Wallulis*, 323 Or. at 348, 918 P.2d 755. Abuse exists if the speaker "either lacked objectively reasonable grounds for the statement or did not, in fact, believe the statement to be true." *Muresan v. Philadelphia Romanian Pentecostal Church*, 154 Or.App. 465, 472, 962 P.2d 711 (1998). A conditional privilege also "may be forfeited by abuse if the defendant's primary purpose in making the defamatory statement was improper and unrelated to the purpose of the privilege." *Wheeler v. Green*, 286 Or. 99, 104, 593 P.2d 777 (Or.1979); see also *Schafroth v. Baker*, 276 Or. 39, 47, 553 P.2d 1046 (1976). On this record, the court concludes defendant Dex is entitled to summary judgment for the following reasons.

## A. Absolute Privilege

 As an initial matter, to the extent plaintiff's claim is based on statements made before the Department of Labor by David Elchoness (Dex's attorney), summary judgment is granted on absolute-privilege grounds. Plaintiff, in fact, does not deny the application of an absolute privilege to that correspondence. Accordingly, Dex's attorney's statement (suggesting Dex fired plaintiff for "enhancement of data" and "falsification ·of documents") does not support plaintiff's claim. Elchoness made the statement in a letter submitted to the Department of Labor as part of Dex's defense against plaintiff's administrative complaint. See *Tillamook Country Smoker*, 732 F.Supp. at 1094 ("The absolute privilege ... applies to administrative agencies in a 'quasi-judicial' capacity.").

## B. Conditional Privilege

██ The remaining statements identified in plaintiff's briefing are protected under a conditional-privilege analysis. Again, construing the record in plaintiff's favor, the gist of those statements was that plaintiff would not permit the removal of bad-debt advertisements in an effort to inflate her sales team's revenue. Plaintiff concedes Dex makes the threshold showing for a conditional privilege, given that the statements, taken at face value, were made to protect the interests of Dex, the employer. Plaintiff, however, argues that Dex lost the privilege by abusing it. Specifically, plaintiff argues the speakers lacked a reasonable basis for believing the statements at issue were true. Plaintiff additionally argues there are material issues of fact about whether Dex published the statements for a purpose unrelated to the purpose of the privilege.

In deciding whether Dex abused its conditional privilege, the court considers separately the various alleged speakers.

### 1. Groves

As an initial point, the only statements by Groves specifically identified by plaintiff are fairly read as "allegations." In her final report, Groves stated plaintiff "[a]llegedly" had allowed bad-debt advertisements to remain in the directory to inflate her revenue. Similarly, in a November draft of her report, Groves charged plaintiff with "inflating revenue"; as plaintiff conceded at oral argument, that charge, read in context, is framed as an allegation.

██ Under Oregon law, there can be no abuse of a conditional privilege when the speaker "republishes a defamatory state-

ment . . . under circumstances that make it clear that it is an allegation, not a fact, that is being repeated." *Vanderselt v. Pope,* 155 Or.App. 334, 345, 963 P.2d 130 (1998). "If merely repeating an accusation that has been made in the context of determining what should be done about it constituted defamation, then employers would be severely crippled in their abilities to verify rumors and accusations by employees about management, or about employees by management, for that matter." *Id.* at 346, 963 P.2d 130. Pursuant to this analysis, Groves did not abuse the conditional privilege by making the two statements specifically identified by plaintiff.[1]

██ In any event, even assuming Groves made other statements which are not fairly characterized as "allegations," plaintiff has failed to show evidence sufficient to defeat defendant's qualified-privilege defense. Plaintiff uses most of her briefing on the abuse issue to challenge the adequacy of Groves's investigation. Although plaintiff's briefing is not entirely clear, it appears she is arguing that whether Groves's report was adequate is relevant to analyzing all the challenged statements made by the different Dex officials. The court fails to see how any errors made by Groves is material to whether other employees had a reasonable basis for the statements they made. Attacking Groves's investigation and report would seem to bear only on whether Groves had a reasonable basis for her statements. In any event, however the issue is approached, plaintiff has not shown that Groves's investigation produces a material issue of fact on the issue of abuse.

---

1. The same conclusion applies with regard to any statements made by Susan Demmin, Groves's supervisor. Demmin allegedly told Groves initially about the accusations regarding plaintiff. Plaintiff's briefing does not even discuss any statements by Demmin, nor does plaintiff dispute Dex's position that Demmin merely repeated allegations made by others. Accordingly, to the extent plaintiff's defamation claim is based on statements made by Demmin, the court grants summary judgment.

Plaintiff first argues that Dex's assigning the investigation to Groves, who lacked personal experience and familiarity with Dex's credit policies, shows a lack of reasonable basis for the alleged statements. The record, however, shows Groves diligently pursued the investigation, interviewing several Dex employees, a number of whom told Groves about plaintiff's reluctance to allow the removal of bad-debt advertisements. Thus, even assuming (as plaintiff alleges) Groves did not attempt to verify Dodson's claims about plaintiff, Groves spoke with other employees who corroborated Dodson's allegations that plaintiff kept bad-debt advertisements in directories. Plaintiff cites no evidence showing that Groves had reason to believe she could not trust the information she received from the various sales and CMO employees.

Plaintiff also argues that most of the bad-debt advertisements were placed in the directories for reasons unrelated to her responsibilities.[2] While plaintiff's analysis of those advertisements may create issues about the *truth* of the statements at issue, truth is not the issue. She must show there was no *reasonable* basis for the statements; she has failed to do that. Again, plaintiff does not challenge the testimony of employees that plaintiff in fact did resist CMO's campaign to remove bad-debt advertisements. Ms. Shaw, plaintiff's boss, called the number of bad-debt advertisements in the 2002 directory "extremely high." Thus, even assuming that plaintiff told Groves that she had no responsibility over some of the bad-debt accounts, Groves's interviews with other Dex employees gave her reason to believe plaintiff's treatment of bad-debt accounts was improper. In just about any employer investigation, investigating officials will be faced with competing stories; that an official believes one side over the other does not, without more, show there was no reasonable basis for the official's charges.

Plaintiff also summarily states the "investigation did not meet Defendant's own basic expectations of fairness." Plaintiff's Memorandum at 25. There is nothing cited from the record indicating Groves acted unfairly. As mentioned, she interviewed several employees and sought guidance from those familiar with the company's credit policies.

In addition, the fact Groves in a meeting with plaintiff challenged plaintiff's management style has no bearing on whether there was a reasonable basis for the statements regarding the bad-debt advertisements. Indeed plaintiff does not even question Groves's statement that plaintiff's sales managers were threatened by her management style. Nor does the fact Groves declined to give plaintiff a copy of a list of the questioned accounts give rise to any material issue; that decision may be subject to challenge on other grounds, but it does not cast meaningful light on whether Dex reasonably believed the allegations against plaintiff. At most, plaintiff's attack on Groves's investigation shows that Groves could have made some different decisions about how to conduct her investigation. But, even assuming Groves made some errors, plaintiff's attack does not create any issues material to whether Groves or any other Dex official lacked a reasonable basis for the challenged statements. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

---

**2.** Specifically, after her termination, plaintiff (relying on documents obtained during discovery) contends she discovered that at least 71 of the bad-debt advertisements related to the 2002 directory were "foreign in," meaning they were advertisements for out-of-state customers over whom plaintiff had little responsibility. In addition, plaintiff argues that at least twenty of the bad-debt advertisements were related to "spare worker" accounts, that is, small-value accounts not assigned to any particular sales representative.

202 (1986) (explaining that for facts to be "material" under summary judgment standard they must be crucial to case's outcome).

### 2. Gibson

In her briefing, plaintiff argues Gibson's primary purpose in making statements about plaintiff was unrelated to the purpose of the conditional privilege. See *Wheeler*, 286 Or. at 104, 593 P.2d 777 (observing conditional privilege is abused if "the defendant's primary purpose" was "improper and unrelated to the purpose of the privilege"). Specifically, plaintiff argues, Gibson did not defame plaintiff out of concern for bad-debt advertisements but "because he was concerned about human resources issues, Defendant losing its sales force, and Plaintiff's alleged alcoholism." Plaintiff's Memorandum at 31. In addition, at oral argument, for the first time, plaintiff suggested Gibson lacked a reasonable basis for his statements, in that he failed affirmatively to verify the allegations underlying his statements.

■ As an initial point, plaintiff offers only speculation that Gibson's motives were unrelated to concerns about bad-debt advertisements. For instance, there is nothing in the record to suggest Gibson wanted plaintiff fired because of her suspected drinking problem. In any case, the court fails to see much logic in plaintiff's argument. Plaintiff seems to argue that Gibson complained about bad-debt advertisements, not because he was concerned about that issue, but because he had other *legitimate* concerns about plaintiff, including that her management style might chase away the company's sales force. But it seems only reasonable to presume that Gibson could have openly revealed the alleged alternative motives—which, again, appear related to legitimate concerns—and thus would have no reason to complain about bad-debt advertisements in an effort to further these other motives. In fact, Gibson testified he did convey his concerns about plaintiff's management style to plaintiff's boss, Ms. Shaw. The inference plaintiff would draw—the statements regarding bad-debt advertisements were actually motivated by other concerns related to plaintiff's management style—is not reasonable. See *Poppell v. City of San Diego*, 149 F.3d 951, 954 (9th Cir.1998) (explaining court-drawn inferences cannot "be mere speculation, intuition or guessing," as the "key to a logical inference is the reasonable probability that the conclusion flows from the evidentiary datum because of past experiences in human affairs"). In short, there is no probative evidence that Gibson's primary purpose in making the alleged statements was "improper and unrelated to the purpose of the privilege." *Wheeler*, 286 Or. at 104, 593 P.2d 777.

■ As stated, plaintiff also contended at oral argument that Gibson lacked any reasonable basis for his statements. Plaintiff bases that argument on the idea Gibson did not verify what he was told about plaintiff's treatment of bad-debt advertisements before Gibson himself repeated the charge. A failure to act affirmatively to verify an allegation, however, is not, itself, sufficient to defeat a conditional privilege. Cf. *Muresan*, 154 Or.App. at 472, 962 P.2d 711 (explaining to show abuse of privilege one must show defendant either lacked "objectively reasonable grounds for the statement or did not, in fact, believe the statement"). If each company official had to verify independently allegations of employee misconduct, internal investigations would become impractical. Here there is no indication Gibson lacked a reasonable basis for trusting the allegations regarding plaintiff. Indeed the only record evidence bearing on the issue suggests that Gibson had no reason to

doubt his sources. For example, Gibson testified that his colleague Mr. O'Connor—whom Gibson had known for at least nine years and considered a friend—expressed concerns about a bad-debt advertisement which O'Connor felt should not be in the directory but which plaintiff insisted be included in the directory. In sum, plaintiff's defamation claim cannot rest on the alleged statements made by Gibson.

### 3. Dodson

Plaintiff makes a two-pronged attack on Dodson's statements: First, plaintiff argues he lacked any reasonable basis to believe the statements he made about plaintiff. Second, she argues Dodson's primary motive was essentially based on anger toward plaintiff for undercutting CMO's authority by using independent contractors to collect debts.

█ In arguing Dodson lacked reasonable grounds to believe his statements, plaintiff relies heavily on the fact Dodson at his deposition could not specifically name which employees had told him that plaintiff was acting improperly. While not remembering specific names, Dodson testified that "various salespeople and sales managers" told him that plaintiff had instructed them not to pull bad-debt advertisements. On this record, the court finds that Dodson's failure to give specific names is insufficient to create a material fact issue regarding the reasonableness of his statements. As mentioned, plaintiff does not challenge the fact that several sales employees did in fact corroborate the charge that plaintiff gave instructions not to pull bad-debt advertisements. In addition, Groves's report, based on several interviews with sales employees, found that plaintiff had "frequently said" sales personnel would not have the desired "leverage" with CMO if they removed bad-debt advertising. Groves's report further found that employees felt put between "a rock and a hard place" by plaintiff's reluctance to remove bad-debt advertising. Groves's findings served to corroborate the anonymous call—which CEO Burnett received and which triggered the investigation in the first place—complaining about plaintiff's refusal "to let people pull advertising out of the books." In sum, Dodson's assertion that "numerous salespeople" had said plaintiff was reluctant to remove bad-debt advertising finds record support.

Moreover, plaintiff does not challenge the fact Dodson relied on internal CMO documents which showed that Portland's sales team failed to remove significant numbers of bad-debt advertisements. Indeed plaintiff does not dispute the fact that the 2002 Portland directory as published included over a $1 million worth of bad-debt advertisements. While plaintiff now contends she was not responsible for many of the accounts which were "foreign in" and "spare worker," she makes no showing that Dodson should have reasonably known many of the bad-debt accounts were of that nature, much less that she was not responsible for those accounts. Even assuming Dodson should have known plaintiff was not responsible for many of the bad-debt advertisements, plaintiff does not rebut other evidence which indicates Dodson had a reasonable basis for his statements. Aside from Groves's interviews with sales employees, it also is undisputed that plaintiff failed to respond to numerous messages from Mr. Basile, Dodson's boss, regarding Portland-area, bad-debt advertisements. Similarly, Gibson testified he had left numerous messages for plaintiff regarding the Action Locksmith account, but plaintiff never responded even though, according to Gibson, "everyone knows" issues involving bad-debt advertisements are "important and need to be handled."

Plaintiff also argues that the fact her sales team ultimately removed $4 million

of bad-debt advertising shows there was no reasonable basis for the statements at issue. Plaintiff, however, cites no evidence showing Dodson or any other alleged speaker knew or should have known that $4 million worth of bad-debt advertisements had been removed. In any event, even if the alleged speakers should have known about the $4 million figure, the fact remains that the 2002 Portland-area directory was published with a large number of bad-debt advertisements. Moreover, as mentioned, Ms. Shaw testified that the number of bad-debt advertisements appearing in the 2002 directory was "extremely high."

The court also rejects plaintiff's argument that Dodson's primary motive in making the statements was to protect CMO from independent contractors. Even assuming Dodson's alleged alternative motive regarding contractors could be characterized as a selfish one unrelated to the company's interests, there is insufficient evidence to show that such a motive was Dodson's *primary* motive in making statements about plaintiff. See *Wheeler,* 286 Or. at 104, 593 P.2d 777 (stating privilege is abused when defendant's *"primary* purpose" was "unrelated to the purpose of the privilege" (emphasis added)). At most, Dodson's testimony showed that he disagreed with the use of independent contractors; there is nothing, aside from pure speculation, to show that Dodson harbored a personal grudge toward plaintiff, much less a grudge so strong he was compelled to make false, defamatory statements about her. The court, therefore, finds plaintiff's cited cases inapposite. Those cases involved evidence persuasively showing that the speakers held personal grudges against the subject of the challenged statements. See *Wallulis,* 323 Or. at 350 n. 7, 918 P.2d 755 (finding fact issues as to whether privilege was abused where speaker "was extremely angry with plaintiff over a work-related disagreement," told colleagues he would "get" plaintiff, and, in fact, had become "enraged, using obscenities and telling others that he would 'tear [plaintiff's] head right off his shoulders' "); *Muresan,* 154 Or.App. at 468, 473, 962 P.2d 711 (finding fact issue as to abuse of privilege where "there was evidence of a personal grudge against plaintiffs," including fact that after plaintiffs challenged speaker's authority, speaker "began to isolate and avoid" plaintiffs and repeatedly made defamatory charges without at all investigation underlying facts).

In addition, plaintiff's testimony that Dodson could be "moody and difficult" is not enough to create a fact issue; such a conclusory assessment would apply to most bosses. Nor does plaintiff's argument that the July "notifier blitz" was vindictive advance her abuse theory. That argument, at most, shows a disagreement with CMO's approach, which may have been rude and disruptive, but plaintiff does not explain, beyond mere speculation, how the blitz shows Dodson's primary motive in making the statements was improper and unrelated to the purpose of the privilege. In sum, plaintiff has not shown there are any material fact issues regarding whether Dodson abused the conditional privilege in making his alleged statements.[3]

---

**3.** In her summary judgment briefing, plaintiff nowhere argues that Mr. Basile's statements abused the conditional privilege. Nevertheless, at oral argument, plaintiff refused to concede that Basile's statements were not actionable. Even if the court were inclined to consider plaintiff's argument regarding Basile, there is no indication his statements abused the privilege. Indeed, as Dodson's boss, Basile for the most part considered the same material as did Dodson; it would seem to make little sense to hold that Dodson's statements did not abuse the privilege but that Basile's statements about the same exact matter did.

### 4. Summary

In summary, on this relatively meager record, there is no "significantly probative" evidence rendering summary judgment inappropriate on the issue of whether defendant abused the privilege. See *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasizing that to defeat summary judgment nonmovant's evidence must create more than "some metaphysical doubt as to the material facts"). At best, plaintiff's evidence shows that company officials disagreed with how to treat bad-debt accounts. While plaintiff certainly disagreed with CMO's credit policies and Dex's tolerance of those policies in this case, plaintiff's disagreement cannot be the basis for finding defendant abused its conditional privilege. Cf. *Lund v. Arbonne Int'l, Inc.,* 132 Or.App. 87, 97 n. 8, 887 P.2d 817 (1994) ("[Plaintiff's argument] is a statement about the way Arbonne operates its business. Standing alone, it permits no inference as to intent or motive.").

### III. CONCLUSION

For the reasons outlined above, the court grants Dex's motion for summary judgment (doc. # 17). Plaintiff simply has not come forward with sufficient evidence showing material fact issues as to whether Dex abused its conditional privilege. As a result, the court dismisses this lawsuit with prejudice, and pending motions, if any, are denied as moot.

IT IS SO ORDERED.