Argued and submitted October 11, 1995, affirmed February 21, petition for review denied April 30, 1996 (323 Or 153)

James E. MORROW,
*Appellant,*

*v.*

II MORROW, INC.;
Michael Piedra;
and United Parcel Service, Inc.,
*Respondents.*

(93C-11611; CA A87206)

911 P2d 964

Asa L. Lewelling argued the cause and filed the brief for appellant.

Thomas W. Sondag argued the cause for respondents. With him on the brief was Lane Powell Spears Lubersky.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Plaintiff appeals a summary judgment for defendants.[1] ORCP 47. The judgment dismisses claims for wrongful discharge from employment, publishing a memo that purportedly cast plaintiff in a false light, and libel. We affirm.

Summary judgment may be granted if the summary judgment record demonstrates

> "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C.[2]

According to the summary judgment evidentiary record, plaintiff was a division manager of II Morrow. In November 1986, UPS acquired II Morrow as a subsidiary. Simultaneously with that acquisition, plaintiff entered into an employment contract with II Morrow. The agreement granted plaintiff a five-year employment term with II Morrow. In September 1990, plaintiff entered into another agreement with II Morrow and UPS. That agreement terminated the 1986 employment agreement and amended the provisions of plaintiff's stock purchase agreement.

In January 1991, Piedra became the general manager of II Morrow. Plaintiff worked under Piedra's supervision. Plaintiff avers that in February 1992, Piedra commenced a series of actions that were intended to make plaintiff's working conditions so intolerable that he would be forced to quit.[3] In March 1993, plaintiff received an anonymous phone call on his voice mail at work. The caller advised

---

[1] Defendants are II Morrow, Inc. (II Morrow), plaintiff's former employer; United Parcel Service, Inc. (UPS), II Morrow's parent company; and Michael Piedra, plaintiff's former supervisor.

[2] In 1995 the legislature enacted Senate Bill 385, which amended ORCP 47 C. 1995 Or Laws, ch 618, § 5. *See Jones v. General Motors Corp.*, 139 Or App 244, 911 P2d 1243 (1996).

[3] Plaintiff's affidavit says:

"I quit because defendant Piedra continued a course of conduct which made it plain that he intended to make the workplace so unbearable that I would quit.

plaintiff to look on the "O" drive on his personal work computer. Plaintiff found a file entitled "Jim" on that drive. He opened the file and discovered that it was a memo written by Piedra describing a meeting that he had had with plaintiff in December 1992. In the memo, Piedra said in part:

"On December 11th [plaintiff] and I sat down to review his performance. I started the evaluation by telling [plaintiff] that I was still not convinced that he really wanted to be a Division Manager for United Parcel Service. I explained to [plaintiff] that I ranked his participation and dedication below the other division managers. He asked me how I could possibly come to that conclusion. I preceded [*sic*] to ask [plaintiff] a number of questions, such as:

"1. When is the last time you were at work prior to 8:00 am. When was the last time you stayed past 5:00 pm. When is the last time you participated with the group when they worked on the weekend.

"2. When was the last time the senior staff came to you for your advise [*sic*] and or imput [*sic*] on one of the projects you are currently working on.

"3. How do you feel you do in the area of keeping me completely informed on where you are in bringing in some of the projects you are currently working on, (new signature pad, new battery, new tooling):

"4. How well do you feel you do in communicating with your fellow senior staff.

"After asking several questions like the ones listed [plaintiff] begin [*sic*] to admit that he was not doing or performing like some of the other senior staff. He told me that after reading the current appraisal form he had to admit that he was rather poor in some of the communication elements. He explained that he thought he was working hard but not sharing his accomplishments with others. He also stated

---

He took my job away from me so I had no one under me. He downgraded my performance report. He made an issue of the sexual harrassment [*sic*] charge after Wesly Hughes told me that a letter would be placed in my personnel file 'and that would be the end of it.' He embarrassed me and my wife by grabbing her and kissing her at Portland Airport after my wife and I had reconciled. He made it plain that I wouldn't get a raise. In short, Piedra made continuance of work at UPS intolerable so I quit."

that he has always felt that if [*sic*] could not get the job done in eight hours, that he felt he was not being effective.

"I explained to [plaintiff] that in every ones' [*sic*] career there were times that extra effort was needed — especially at a level of management that he is presently at. I said that with all that has happened with Diad II and with his problems earlier in the year (sexual harrassment [*sic*] charge), I more than expected additional efforts on his part. I explained that I constantly get calls concerning where we are on the evaluation of additional signature pads, and I am always at a lost [*sic*] as to what to answer because of not being fully up to speed where the process is. [Plaintiff] stated that I was right and he sees now how important it is to work on his communication skills.

"At this time I'm sure that my talk did some good with [plaintiff] and that I will see marked improvement in the areas I discussed with him. How long [plaintiff] will continue to improve only time will tell.

"My overall evaluation of [plaintiff] is still somewhat low comparing him to the rest of the senior staff."

In their answer, defendants admitted that the memorandum was written by Piedra, but denied the remaining material allegations of plaintiff's complaint. In an affidavit in support of defendants' motion for summary judgment, Piedra testified that he had met with plaintiff in December 1992 to discuss plaintiff's work performance. After the meeting, Piedra contacted Wesley Hughes, a vice president of UPS, and discussed the meeting that he had had with plaintiff. Hughes directed Piedra to send him a memorandum summarizing the meeting. In his affidavit Piedra said, in part:

"7. I began drafting the memorandum after receiving Mr. Hughes' directive. As I was drafting the memorandum, I saved it in a file labeled 'Jim.' I believed that I was saving the memorandum on my terminal only. I believed also that no one else on the network could access the file while as [*sic*] I was working on it.

"8. After I completed the memorandum, I printed two copies of it. I sent one copy to Mr. Hughes, as he had requested. I placed the other copy in a confidential file. No one had access to the file.

"9. I then took steps to delete the file labeled 'Jim.' After I did this, I believed that the file no longer existed. I

believed also that the only two copies of the memorandum were the copies I printed for Mr. Hughes and myself.

"10. After [plaintiff] resigned in April 1993, I learned that I had failed to delete the file labeled 'Jim' from the network. As I now understand, a document drafted on an employee's computer terminal would be saved on the network's 'O drive.' In this case, the file labeled 'Jim' was saved on the O drive after I had 'deleted' it. This means that other employees who used the O drive could have accessed the memorandum. In order to do so, however, they would have had to call up the list of files on the O drive, find the file labeled 'Jim,' and then retrieve the file and open it."

Shortly after plaintiff discovered the memorandum on the "O" drive, he submitted his resignation to Hughes. In his affidavit, Hughes testified:

"I told [plaintiff] I would not accept his resignation and that there had to be a way to work this out. [Plaintiff] seemed adamant that he was going to resign over this incident.

"[Plaintiff] said he was resigning and this was his 'last day'. I told him again that I would not accept his resignation and asked him to take some time to think this through.

"[Plaintiff] said he had a 'lot of time' to think about this, since he had found out about it 'some time ago' and had made up his mind.

"I told [plaintiff] that if his problem was with Mike Piedra, that in a year or so I planned to move Mike to another assignment and that I was sure that we could find an assignment that would be acceptable to him for the time being."

Hughes' imploration did not succeed. Plaintiff quit and filed this action. Plaintiff's first claim alleges a "constructive wrongful discharge from employment." Defendants moved for summary judgment against the claim, in part on the ground that plaintiff had not been constructively discharged. Defendants argue that the only evidence is that defendants employed extensive efforts to convince plaintiff to stay as their manager. The trial court granted summary judgment, concluding in part that no constructive discharge had been demonstrated by plaintiff. Plaintiff assigns error to the trial court's ruling.

■ In *McGanty v. Staudenraus*, 321 Or 532, 557, 901 P2d 841 (1995), the Supreme Court set forth the elements for a wrongful constructive discharge stemming from unacceptable working conditions. It held that plaintiff must allege and prove:

> "(1) the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired *to* cause the employee *to* leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave employment as a result of those working conditions." (Footnotes omitted; emphasis in original.)

In this case, there is no evidence that demonstrates that defendants intentionally created or maintained working conditions with the desire to cause plaintiff to leave employment or that they knew that plaintiff was certain, or substantially certain, to leave employment as a result of working conditions. Plaintiff argues that the information in the memorandum in the "O" drive file creates an issue of fact as to that element. However, the evidence shows nothing more than that which defendants have conceded: that the memorandum was unintentionally saved to the "O" drive even after Piedra believed that he had deleted it. Plaintiff offers no other argument about defendants' intentions. The trial court did not err in granting summary judgment against plaintiff's claim for wrongful constructive discharge.

■■ In his second assignment of error, plaintiff argues that "the trial court erred in dismissing [his] claims for false light and libel on the grounds that there had been no adequate publication." Initially, we address plaintiff's claim of libel. Historically, Oregon courts have looked to the *Restatement of Torts* for guidance concerning defamatory torts. *See King v. Menolascino*, 276 Or 501, 502-03, 555 P2d 442 (1976); *see also Beecher v. Montgomery Ward & Co.*, 267 Or 496, 499-500, 517 P2d 667 (1973) (holding that the *Restatement* test is the applicable test for what is considered defamatory).

Publication is an essential element of the tort of libel. *State ex rel Advanced Dictating v. Dale*, 269 Or 242, 247, 524 P2d 1404 (1974). The *Restatement (Second) of Torts* § 577 defines what constitutes publication:

> "(1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed."

In this case, the evidence is uncontroverted that defendants did not intentionally or negligently publish the memorandum on the "O" drive. The only evidence is that publication, other than to Hughes, was inadvertent.[4] *Restatement* § 577, *comment O*, discusses the effect of an accidental communication:

> "The accidental communication of matter defamatory of another to a third person is not a publication if there was no negligence. Thus, an act that is not intended to communicate to a third person matter that is defamatory and which does not create an unreasonable risk of the communication is not a publication."

In *Prosser and Keeton on Torts* § 113, at 803 (5th ed 1984), the authors agree with the *Restatement* comment:

> "Courts have never imposed strict liability on the defendant for accidental and non-negligent publication of defamatory matter. There is in fact no liability for publication which the defendant did not intend and could not reasonably anticipate, as in the case of words spoken with no reason to suppose that anyone but the plaintiff would overhear them, or a sealed letter sent to the plaintiff himself which is unexpectedly opened and read by another." (Footnotes omitted.)

Plaintiff did not offer any evidence in the summary judgment record from which an objectively reasonable juror could infer that Piedra acted negligently. The only evidence is that Piedra believed that he had deleted the "Jim" file and that it no longer existed on the data base. We conclude that

---

[4] Plaintiff does not contend that a tort was committed when the memorandum was transmitted from Piedra to Hughes.

the trial court properly granted summary judgment on plaintiff's claim for libel because there is no evidence that defendants intentionally or negligently communicated the contents of the memorandum to a third party.

 The gravamen of a claim for placing a person in a false light involves an invasion of privacy. In *Dean v. Guard Publishing Co.*, 73 Or App 656, 699 P2d 1158 (1985), we held that a person who places another before the public in a false light could be liable for damages. We said that the elements of the tort are as stated in the *Restatement (Second) of Torts* § 652E:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> "(b) the actor has knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Thus, like defamation, a false light claim also requires publication. However, the publication requirement is different for a false light claim in that the matter published must be to the public generally or to a large number of persons. *Doe v. Portland Health Centers, Inc.*, 99 Or App 423, 429, 782 P2d 446 (1989), *rev dismissed* 310 Or 476 (1990).

*Restatement (Second) of Torts* § 652D *comment a* discusses the "publicity" requirement for an invasion of privacy claim:

> "The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. 'Publicity,' as it is used in this Section, differs from 'publication,' as that term is used in § 577 in connection with liability for defamation. 'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person. 'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or

by any other means. *It is one of a communication that reaches, or is sure to reach, the public.*" (Emphasis supplied.)

In this case, plaintiff has not presented evidence that defendants gave "publicity" to Piedra's memorandum such that it reached or was sure to reach either the public generally or a large number of persons in plaintiff's work community. In fact, the only evidence regarding the publicity given to the memorandum was that an anonymous caller knew that it existed on a private company's database under a nondescript title. In a deposition, plaintiff testified:

"Q. Up to the point that you left the company, were you aware of anyone who had seen the memo, or seen the memo on the O drive, other than — or anywhere on any computer anywhere else — other than Mr. Piedra, Mr. Hughes, yourself, and whoever left a voice mail as you described?

"A. No.

"Q. Since you left the company, are you aware of anyone who has seen the December 11th memo, or copies of it?

"A. Everybody involved.

"Q. Other than those involved in the direct litigation —

"A. No."

Without evidence that the memorandum was communicated to the public generally or to a large number of persons, plaintiff has not established an essential element of the tort. Summary judgment was also properly granted as to this claim.

Affirmed.