Argued and submitted October 8, 1997, affirmed June 17, petition for review denied October 28, 1998 (327 Or 621)

Victor MURESAN
and Vicky Muresan,
husband and wife,
*Respondents,*

*v.*

PHILADELPHIA ROMANIAN
PENTECOSTAL CHURCH,
aka, Romanian Assembly Church of God,
and Nicky Pop,
*Appellants,*

*and*

Gavrila LEUSCA,
Mihai Contra, Dragos Salar, Pavel Dobra,
Petru Dehelean, Willy Willson, Flore Gherman,
Vasile Ianos, Pavel Covaci, Vasile Onofrei
and Gabriel Leusca,
*Defendants.*

(9412-08243; CA A93142)

962 P2d 711

Peter R. Chamberlain argued the cause for appellants. With him on the briefs was Bodyfelt Mount Stroup & Chamberlain.

Margaret H. Leek Leiberan argued the cause for respondents. With her on the brief were Ivan M. Karmel and Leiberan & Gazeley.

Before Riggs, Presiding Judge, and Landau and Wollheim,* Judges.

LANDAU, J.

_____
* Wollheim, J., *vice* Leeson, J., resigned.

**LANDAU, J.**

Defendants[1] seek reversal of the judgment following the jury's verdict for plaintiffs finding defendants liable for slander and invasion of privacy. We affirm.

We view the facts drawn in the light most favorable to plaintiffs as the prevailing parties. *See Brown v. Boise-Cascade Corp.*, 150 Or App 391, 329 n 4, 946 P2d 324 (1997); *Hickey v. Settlemier*, 141 Or App 103, 108, 917 P2d 44, *rev den* 323 Or 690 (1996). Plaintiffs, Victor and Vicky Muresan, are Romanian immigrants who are members of defendant Philadelphia Romanian Pentecostal Church, which is affiliated with the Assemblies of God denomination. Defendant Nicky Pop is a pastor at the church. Plaintiffs made their living by running an adult foster home that always was filled to capacity. Victor is an ordained pastor within the Pentecostal faith and occasionally preached at the church. Vicky maintained certification as a nurse and was a popular midwife in the Romanian community. The Muresans attended church services and meetings several times a week. The church was the central focus of their lives.

In 1992, the church members planned to build a new church building. There ensued some debate over whether the new building would belong solely to them or to the Assemblies of God. Pop called for a secret vote to decide the ownership of the building, and the majority of votes favored separation from the Assemblies of God. Pop stated that he would take action to effectuate the vote. One or two months later, however, Pop announced that the church would remain with the Assemblies of God and that anyone not in favor of that decision could leave. At some point after that statement, Pop remarked to members at a meeting that the new construction would not belong to the Assemblies of God. Hearing the inconsistency in Pop's statements, Victor asked Pop to put what he said in writing. Pop dated and signed a blank piece of paper, and Victor asked him to write what he had said on the paper, which he then did. After that incident, Pop's attitude

---

[1] Seven individuals, all members of the board of the Philadelphia Romanian Pentecostal Church, also were named as defendants, but the claims against them were dismissed and are not relevant to this appeal.

toward Victor changed, and Pop began to isolate and avoid him.

On October 3, 1993, three of plaintiffs' children were injured in an automobile accident. While stopped at an intersection, they were hit from behind by a car driven by Mishel Contra, the daughter of another church family. Mishel had only a driver's permit and not a driver's license. One of the children, Daniela Muresan, who was an adult, telephoned the police to report the accident. She was informed that her insurance company would handle it and that the police would not come to the accident site because no one was bleeding. Mishel's father, Mihai Contra, arrived at the site, but refused to give Daniela his insurance policy information. He stated that he would speak about the accident only with Victor. The next day, Mihai spoke with Victor and offered to buy the Muresan's car. He said that he wanted to avoid having the Muresans file a report on the accident, because he did not want his daughter to have a bad record for driving without a license. Mihai later delivered a letter to Victor stating that he would stop by that evening with a check for $2,000 to buy the car and that he would pay the balance in the future. Victor waited at home, but Mihai never called or appeared.

Meanwhile, Daniela knew that Oregon law obliged her to report the accident within 72 hours, and, two days after the accident, she reported the accident to the Department of Motor Vehicles and filed a report with her insurance agent. She did not tell her parents about reporting the accident until after the fact. At the same time, she began experiencing headaches and dizziness and went to a chiropractor. She received treatment for her injuries for approximately four months. Daniela's sister, Gabriela Muresan, also was injured in the accident and sought treatment for her neck and lower back. Daniela hired an attorney, and she and Gabriela settled their insurance claims so that all attorney and medical bills were paid, and they each received $4,000 for pain and suffering.

Victor heard nothing more about the accident from Mihai or any other church member, and he continued to preach occasionally and to participate in church activities. Two months after the accident, however, Pop told Victor that

he should come in front of the church board, because Contra was "squeezing my throat, my neck, because I call you to preach." A day or two later, on December 8, 1993, the board met, and Victor appeared. The board meeting opened with Mihai describing his "unhappiness" with the fact that Victor's daughter had filed a report about the accident. Victor replied that he was not responsible for his daughter's actions because she was 21 years old and it was her car. At that point, several board members expressed their disapproval of Victor for allowing his daughter to file the report and for his continuing to preach when he knew that Mihai had something against him. When the discussion ended, Pop announced to Victor that he could leave the meeting and that the board would send him its response in writing.

No response came, and, during the next three months, Victor was not assigned any activities in the church. He did continue to work on the construction of the new church with the other men, however. While working on the construction, church members began to ask Victor whether what was being said about him was true—that he was taking his children to the doctor and having them pretend to be sick to get money from the Contra family. At the same time, the Muresans noticed that people from the church began to distance themselves from the family. Approximately four months after the board meeting, Pop told Victor that Mihai wanted to make peace with him and inquired as to whether Victor wanted the same. Victor replied that he never had any problem with Mihai, but that he was willing to meet and make peace at any time. A few days later, Victor ran into Mihai at the church, and they talked together for about two hours and made peace with each other. Pop approached and expressed pleasure that peace had been made, yet declined Mihai's request that the peace be declared in front of the board, stating that it was not necessary, because he, Pop, represented the board.

Some time after that, another church member told Victor that Pop had said to him that "[Victor] took the Contra family to court to get money and he sent his kids to the doctor to pretend they are ill just to get money from a family[.]" In May, Victor again was called before the board to discuss the matter of the accident. He appeared at a meeting on May 20,

1994, at which Mihai stated that Victor should not be allowed to preach for the next three years, because the Contra family had to pay high insurance premiums for that amount of time. Pop accused Victor of taking his children to the doctor and having them pretend to be sick so that he could take money untruthfully from the Contras. Neither Pop, nor any other church member, ever investigated the facts of the situation to ascertain the extent of damage done to the car or the injuries suffered by the passengers. Pop did not know whether the Muresan children, in fact, were injured by the accident.

Victor and Vicky filed a complaint against Pop on December 5, 1994, alleging defamation and other torts. They later amended their complaint to allege invasion of privacy by placing the Muresans in a false light. The complaint also named the church as a defendant, vicariously liable for the tortious conduct of its employee, Pop. Following the filing of the complaint, Pop made further statements about the Muresans to approximately 200 people gathered at a meeting held on February 25, 1995. He stated that the Muresans's daughters went to the doctor pretending to be sick and that Victor had an arrangement with his doctor and his lawyer in an effort to get "untrue" money from Mihai. The next day, in front of the entire church assembly of several hundred people, Pop again accused the Muresan family of acting fraudulently. Plaintiffs later amended their complaint to include additional allegations of defamation by Pop.

At the close of trial, defendants moved for a directed verdict on the defamation and false-light claims. In the alternative, and on the same grounds, they moved to strike all of the defamation and false light allegations. As to the defamation claim, defendants offered two arguments. First, defendants contended that whatever statements Pop made about plaintiffs were subject to a qualified privilege, because those statements were made for a religious purpose. Second, defendants contended that plaintiffs failed to prove that Pop defamed them. Specifically, they argued that, because plaintiffs had failed to plead or prove pecuniary harm caused by Pop's statements about the Muresans, plaintiffs could prevail only if they proved that Pop had committed slander *per se*, and plaintiffs failed to prove that. Plaintiffs responded that any qualified privilege that might otherwise have applied

was lost, because Pop lacked reasonable grounds to believe that his statements were true, because the statements served no religious purpose and because they were, in fact, made in pursuit of a grudge against Victor. Plaintiffs further responded that they proved that Pop committed slander *per se* by establishing that he repeatedly accused them of committing criminal fraud.

As to the false-light claim, defendants again asserted a defense of qualified privilege. They also contended that plaintiffs failed to prove the elements of a false-light claim, because the evidence at trial failed to show any widespread publication or actual malice. Plaintiffs responded that, as with the defamation claim, any qualified privilege that otherwise might have applied was lost. They also responded that the evidence showed publication to a sufficiently large segment of the community to satisfy the publication element of their false-light claim and that they established Pop's malice by demonstrating his reckless disregard for the truth of the defamatory statements.

The trial court agreed with plaintiffs and denied the motions. The court instructed the jury on both claims. It also delivered an instruction on defendants' qualified privilege defense. It informed the jury that defendants were entitled to a privilege as to any statements that Pop made during board meetings, church services, conferences and meetings, but that defendants forfeited that privilege if Pop abused it. No one took exception to the instruction. The jury returned a verdict in favor of plaintiffs. In a special verdict form, it found that Pop had slandered and invaded the privacy of both plaintiffs. It awarded $3,000 economic damages to both plaintiffs, $162,500 in noneconomic damages to Vicky and $87,500 in noneconomic damages to Victor.

On appeal, defendants assign error to the trial court's denial of their motion for a directed verdict as to the defamation claim. In support of their assignment, defendants contend that the court's ruling was erroneous because: (1) Pop's statements were subject to an absolute privilege afforded by the religious freedom guarantees of the federal and state constitutions; (2) Pop's statements were subject to a

qualified privilege, which Pop neither abused nor exceeded; and (3) plaintiffs failed to prove slander *per se*.

We do not address defendants' first contention, that Pop's statements were subject to an absolute constitutional privilege. The argument was not raised below, and we will not entertain it for the first time on appeal. *Brokenshire v. Rivas and Rivas, Ltd.*, 327 Or 119, 121, 957 P2d 157 (1998).

We turn to the contention that Pop's statements were subject to a qualified privilege. At the outset, we note that whether Oregon law recognizes a qualified privilege for statements made during religious proceedings is not before us. The trial court instructed the jury that the privilege—if not abused—pertains, apparently based on decisions from other jurisdictions to that effect. *See, e.g., Korean Presbyterian Church v. Lee*, 75 Wash App 833, 841-43, 880 P2d 565 (1994) (recognizing qualified privilege in action for defamation brought by church members against church officials for statements made during church meeting). No one took exception to that instruction, however. The only question before us is whether, assuming that such a privilege exists, there was evidence to support a jury finding that it was forfeited.

■■ Under Oregon law, a qualified privilege to make a defamatory statement may be lost if a plaintiff demonstrates that the individual making the defamatory statement either lacked objectively reasonable grounds for the statement or did not, in fact, believe the statement to be true. *Walsh v. Consolidated Freightways*, 278 Or 347, 356-57, 563 P2d 1205 (1977). A qualified privilege also may be forfeited upon proof that it was uttered for a motive unrelated to the purpose of the privilege. *Wattenburg v. United Medical Lab.*, 269 Or 377, 380, 525 P2d 113 (1974).

Whether Pop forfeited his privilege thus depends on whether there is evidence that he lacked objectively reasonable grounds for making his statements about plaintiffs, that he did not believe those statements to be true or that he made the statements for something other than religious purposes. In reviewing the trial court's decision to let that question go to the jury, we examine the record for any evidence in support of the jury's ultimate verdict. *Hickey*, 141 Or App at 108.

■ Our review of the record reveals evidence both that Pop lacked a reasonable basis for his statements and that he made those statements for other than a religious purpose. He testified that he did not know, and made no effort to determine, whether the Muresan children, in fact, were injured, even though he told others repeatedly that they were not. He testified that he did not know, and made no effort to determine, whether, in fact, plaintiffs encouraged their children to submit false insurance claims, even though he told others repeatedly that plaintiffs did precisely that. Moreover, there was evidence of a personal grudge against plaintiffs, arising out of Victor's challenge to Pop's authority regarding the construction and ownership of the new church building, and that Pop made the defamatory statements because of that grudge, not for a religious purpose. We conclude that the trial court did not err in rejecting defendants' motion for a directed verdict on the defamation claim based on the defense of a qualified privilege.

■ There remain defendants' contentions concerning the sufficiency of the evidence of slander *per se*. Defendants acknowledge that accusing plaintiffs of defrauding the Contras or the insurance company would amount to accusing them of a crime. *See* ORS 164.085 (theft by deception). They nevertheless contend that the evidence shows that Pop never suggested that plaintiffs committed any crime, only that he upbraided them for failing to resolve their differences with the Contra family in a Christian way.

■■ To establish a claim of defamation, a plaintiff must show that the defendant communicated a defamatory statement about the plaintiff to a third party. *Wallulis v. Dymowski*, 323 Or 337, 342-43, 918 P2d 755 (1996). If the statement was of a particular character—specifically, if it accused the plaintiff of committing a crime or derogated the plaintiff's business, trade or profession or asserted that the plaintiff had a loathsome disease—the plaintiff is not required to establish that the publication of the statement caused economic damage. *Hinkle v. Alexander*, 244 Or 267, 273, 417 P2d 586 (1966). In such cases, the defamation is referred to as defamation *"per se." Id.* In this case, there is evidence that Pop repeatedly accused plaintiffs of having fabricated their daughters' injuries to obtain money from the

Contra family. Pop may not explicitly have given plaintiffs' conduct the name of a particular crime, but he did accuse them falsely of having committed a crime. That is all the law requires. Defendants' argument to the contrary applies a "spin" to the evidence to which they are not entitled. In reviewing the trial court's denial of the directed verdict motion we examine the record for any evidence, viewed in the light most favorable to plaintiffs, who prevailed, not defendants, who did not. *Hickey*, 141 Or App at 108. The trial court did not err in denying defendants' motion for a directed verdict on the defamation claim.

Defendants next assign error to the trial court's denial of their motion for a directed verdict on the false-light claim. In support of the assignment they contend that the court's ruling was erroneous because: (1) Pop's statements were subject to an absolute privilege; (2) Pop's statements were subject to a qualified privilege, which he did not forfeit; and (3) because there is insufficient evidence of the elements of a false-light claim, specifically publication and malice.

■ We do not address defendants' claim of absolute privilege, because, as we have stated, that claim was not preserved below. We likewise do not address defendants' claim of qualified privilege, because, as we have stated, there is evidence that whatever privilege otherwise may have applied was forfeited. Defendants, in fact, concede that, if the privilege was lost as to the defamation claim, it was lost also as to the false-light claim.

That leaves the sufficiency of the evidence as to the false-light claim. "False light" refers to one of four separate theories that comprise the tort commonly known as "invasion of privacy." *Mauri v. Smith*, 324 Or 476, 482, 929 P2d 307 (1996). In *Morrow v. II Morrow, Inc.*, 139 Or App 212, 911 P2d 964, *rev den* 323 Or 153 (1996), we described the elements of a false-light claim by reference to the *Restatement (Second) of Torts* § 652E:

> " 'One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

" '(a)   the false light in which the other was placed would be highly offensive to a reasonable person, and

" '(b)   the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.' "

*Id.* at 220 (quoting *Restatement (Second) of Torts* § 652E).

■     Defendants' first contention with respect to the false-light claim is that plaintiffs failed to prove the element of publication. According to defendants, to prevail on the claim, plaintiffs must establish that Pop published false information about them "to the public at large." In *Morrow*, we explained that the element of publication is satisfied by proof that the false information "reached or was sure to reach either the public generally or a large number of persons in plaintiff's work community." *Morrow*, 139 Or App at 221. In this case, there was evidence that plaintiffs' entire community of friends, relatives and acquaintances were members of the church and that Pop made false statements about plaintiffs in church meetings of hundreds of members at a time. We conclude that the evidence was sufficient as to the element of publication.

■ ■     Defendants' second contention with respect to the false-light claim is that plaintiffs failed to prove the element of malice, which they argue requires evidence of actual intent to harm. In support of that argument, defendants rely entirely on the use of the word "malice" in *McNabb v. Oregonian Publishing Co.*, 69 Or App 136, 143, 685 P2d 458, *rev den* 297 Or 824 (1984), *cert den* 469 US 1216 (1985). In *McNabb*, however, we used the word "malice" expressly to describe what is required by subsection (b) of the *Restatement (Second) of Torts* § 652E. *McNabb*, 69 Or App at 143 ("Subsection (b) requires that a plaintiff prove actual malice."). We did not alter the nature of the element so that it requires proof of more than either knowledge of or reckless disregard as to the falsity of the publicized matter. *See Reesman v. Highfill*, 149 Or App 374, 387-88, 942 P2d 891 (1997), *rev allowed* 326 Or 464 (1998) (*McNabb* held that malice is shown by evidence of knowledge of or reckless disregard for falsity). In this case, there is evidence that Pop repeatedly made false statements with no regard for their truth or falsity. We conclude that the

evidence was sufficient as to the element of publication and that the trial court did not err in denying the motion for a directed verdict as to the false-light claim.

Defendants include a number of other assignments of error in their appeal. We have considered each of them and reject them without further discussion.

Affirmed.