Argued and submitted March 18, judgment on plaintiff's claim for defamation
*per se* reversed and remanded; otherwise affirmed October 1, 2014

Roland HERRERA,
an individual,
*Plaintiff-Appellant,*

*v.*

C & M VICTOR COMPANY,
an Oregon corporation,
*Defendant-Respondent.*

Marion County Circuit Court
12C12976; A153682

337 P3d 154

Dennis Koho argued the cause for appellant. On the briefs were Daniel J. Rice and Heltzel, Williams, Yandell, Roth, Smith, Petersen & Lush, P.C.

Jay W. Beattie argued the cause for respondent. With him on the brief was Lindsay Hart, LLP.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

## HADLOCK, J.

Plaintiff is a former public employee who sued defendant for defamation and tortious interference with an employment relationship after defendant's agent made various accusations against plaintiff during a 9-1-1 call and in a message to plaintiff's supervisor. As clarified in litigation, the defamation claim encompassed allegations of both ordinary defamation, resulting in special damages, and defamation *per se*. In its answer, defendant denied certain of the allegations in plaintiff's complaint, raised affirmative defenses related to privilege, and asserted a counterclaim for attorney fees under ORS 20.105, alleging that plaintiff's claims had "no objectively reasonable basis." On the parties' cross-motions for summary judgment, the trial court granted summary judgment to defendant on each of plaintiff's tort claims, resulting in dismissal of plaintiff's case, and granted summary judgment to plaintiff on defendant's counterclaim. Plaintiff appeals, arguing that the trial court erred by granting summary judgment to defendant and by denying plaintiff's motion for partial summary judgment insofar as it related to defendant's liability on plaintiff's claim for defamation *per se*. We reverse the dismissal of plaintiff's claim for defamation *per se* and remand for further proceedings on that claim, and we otherwise affirm.

We begin by addressing plaintiff's contention that the trial court erred by granting defendant's motion for summary judgment on plaintiff's tort claims. Accordingly, we set forth the facts in the light most favorable to plaintiff as a prelude to determining whether—viewed in that light—the evidence creates a genuine issue of material fact that should have precluded the trial court from entering judgment for defendant as a matter of law. *Adair Homes, Inc. v. Dunn Carney*, 262 Or App 273, 276, 325 P3d 49, *rev den*, 355 Or 879 (2014).

Plaintiff worked as a customer service representative for the City of Keizer Public Works Department, where he assisted with the maintenance of the city's water system. Defendant owns Little Caesars restaurants in Salem and Keizer. In April 2011, plaintiff's daughter went to defendant's Keizer restaurant and attempted to use a $25 gift card that

plaintiff had purchased there. The card was declined, and plaintiff's daughter then called plaintiff, who went to the restaurant to try to resolve the issue. Plaintiff arrived in a city van, wearing his work clothes and displaying a city identification badge. According to plaintiff, he explained to a person that worked at the restaurant, Arreola, that he had purchased the gift card and that it had never been used. When Arreola still would not honor the gift card, plaintiff left the restaurant and returned with the receipt for the gift card. Arreola again refused to honor it. Plaintiff asked to speak with the manager, and Arreola, after telling him that the manager was not available, took plaintiff's name and phone number. Plaintiff left the restaurant.

After four days passed, plaintiff still had not received a call from anyone at Little Caesars, so he returned to the Keizer restaurant. He again arrived in a city van, wearing his work clothes and displaying a city identification badge. According to plaintiff, Arreola initially refused to provide a refund or make any other accommodation, but then she called Salmon, a regional manager who worked in defendant's Salem restaurant. After speaking with Salmon, Arreola agreed to give plaintiff a refund, provided that he return the gift card and sign a document acknowledging receipt of the refund. Plaintiff left the restaurant to make a copy of the gift card for his records, then returned to the restaurant, signed the document, and received a refund.

Plaintiff acknowledges that he was upset during both of his interactions with Arreola, and that he raised his voice. Plaintiff also acknowledges that, while signing the document for his refund, he asked Arreola, "Where do you live? Do you live here in Keizer?" Arreola told plaintiff that she did not live in Keizer. He responded by saying, "I live and work here in the city," and he stated that Arreola could "look [him] up." According to plaintiff, he thought that, if Arreola lived in Keizer, she might know of him and realize that he was not attempting to defraud a community business. However, Arreola felt threatened by the question.

Meanwhile, Salmon called plaintiff's supervisor from defendant's Salem restaurant and left a detailed voice-mail message, asserting that plaintiff had been "causing

quite a lot of problems" over an issue with a gift card. Salmon accused plaintiff of, among other things, going "on a pretty good rant about who he was and how important he was, and how much business they lost," "going around the lobby telling people to leave and not to order anything [at the restaurant]," "threaten[ing Arreola] * * * he wanted to know where she lived and [told her] that she would have problems if she lived in Keizer with her utilities," and "threatening to cut off [Arreola's] water, or something." Salmon added that plaintiff "kept flashing his badge and talking about who he was so I'm making some calls and finding out who he is, I guess."

Salmon also called 9-1-1, reporting that he had a complaint about a person who he needed to keep out of his restaurant. He explained to the 9-1-1 operator that plaintiff "had issues on Friday with a gift card. It was declined. He bought it six months ago and there's no money left on it so he insisted that it was never used * * * so we couldn't give the money back because * * * it was used." Salmon further stated that "he came back today and he started threatening [Arreola]. I guess he works for the water [department] and he was trying to get where she lived and that she was going to have problems with her utilities and that's taking it a little bit too far."

A Keizer police officer responded to defendant's restaurant to speak with Arreola. The officer called a phone number listed on the back of the gift card, and was informed that the full $25 purchase amount was still available on the card. Plaintiff, who had since left the restaurant, saw that the officer was there and returned to speak with him. The officer gave plaintiff a verbal trespass warning and told him not to come back to the restaurant.

Three days later, in an unrelated incident, a citizen reported to the city that plaintiff was purchasing items at a garage sale while wearing his city work clothes and driving a city van.

The city placed plaintiff on administrative leave and investigated both the restaurant incident and the report that plaintiff had been at the garage sale while on duty. After the investigation and a hearing, the city's public-works director

recommended to the city manager that plaintiff's employment be terminated. In a detailed memorandum to the city manager, the director identified the issues under investigation as follows:

"1.   Whether or not [plaintiff] violated City standards by intimidating, harassing, threatening or engaging in bullying behavior directed towards the Manager of [Little Caesars] while wearing City insignia and/or identifying himself as a City employee?

"2.   Whether or not [plaintiff] was operating as a City employee or 'off the clock' during his visits to [Little Caesars] and to the yard sale.

"3.   Whether or not [plaintiff] was honest in his answers when he was questioned about his actions during the various interactions with the public.

"4.   Whether or not [plaintiff] was inappropriately using a number of City resources during this time period including his City vehicle, City land line, City computer."

The director wrote that "the evidence supports the conclusion that [plaintiff] was not truthful during the course of the investigation and due process proceeding. His misrepresentations were not the product of lack of recollection or confusion. They were intentional." Moreover, the director made the following specific findings:

"1.   [Plaintiff] intentionally misrepresented the timing and number of his visits to [Little Caesars] on May 3rd in an effort to falsely claim that those visits occurred during his lunch hour.

"* * * * *

"2.   [Plaintiff] intentionally misrepresented that he placed the call to [the Little Caesars] corporate headquarters from his home phone.

"* * * * *

"3.   [Plaintiff] falsified his time sheet on April 29th and May 3rd by failing to deduct the time he had spent purs[u]ing a personal dispute at [Little Caesars] from his hours worked[.]

"* * * * *

"4. [Plaintiff] was not truthful when he described the substance of his interactions with the Manager of [Little Caesars][.]

"* * * * *

"5. [Plaintiff] was not truthful when he told [the police officer] that he 'probably' had his ID on when he confronted [Arreola] earlier that day.

"* * * * *

"6. [Plaintiff] was not truthful when he repeatedly insisted that he was doing locates in the Verda Lane area on May 6th and did not go to that area to shop at the garage/estate sale. [Plaintiff] was also untruthful when he repeatedly stated that he did not purchase anything from the garage/estate sale on May 6th.

"* * * * *

"7. [Plaintiff] compounded his lack of truthfulness by influencing a witness to make a false representation on his behalf and submitting a statement containing that false misrepresentation to the City during his due process hearing."

The director concluded that,

"while the City could justify taking a lesser form of discipline against [plaintiff] for using City time and resources to conduct personal pursuits *and* harassing and intimidating a citizen with threats that the pizza shop she manages would suffer a loss of business due to his importance and influence at the City (and related rude and inappropriate conduct[)], a lesser form of discipline cannot be justified given the many dishonest statements made by [plaintiff] during the course of the investigation."

(Emphasis in original.) The city manager notified plaintiff that he agreed with the recommendation in the director's memorandum, and he terminated plaintiff's employment "for the reasons set forth in that memo."

Plaintiff subsequently sued defendant, claiming that defendant, through its agent, Salmon, defamed plaintiff by making false statements to plaintiff's supervisor and to the 9-1-1 operator. Specifically, plaintiff alleged that defendant had falsely claimed that plaintiff (1) attempted

to defraud or steal from the restaurant by using a gift card with no funds available on it, (2) intimidated or bullied Arreola by, among other things, "flashing his badge," and (3) threatened to cut off Arreola's city utility service. Plaintiff alleged that the false statements had resulted in plaintiff being placed on administrative leave and, eventually, terminated from his job. He further claimed that the defamation had caused him special damages ("in the form of lost earnings and benefits in the amount of $250,000") and general damages ("for loss of reputation, including * * * mental and emotional distress and humiliation, in the amount of $50,000"). Plaintiff also alleged that defendant's actions constituted tortious interference with his employment relationship, causing plaintiff to lose his job and suffer damages, again "in the form of lost earnings and benefits in the amount of $250,000."

In its answer, defendant asserted two affirmative defenses: that the statements at issue were conditionally privileged because they were made "in good faith regarding a matter in which Defendant's representatives had an interest and was communicated to persons with a corresponding interest or duty related to the matter," and that they were privileged because they "were in good faith and made regarding a matter of public interest."[1]

Plaintiff moved for partial summary judgment, asserting that the elements of defamation, defamation *per se*, and tortious interference were satisfied as a matter of law, leaving only the question of damages for the jury. In addition to his own declaration, plaintiff submitted as evidence defendant's formal admissions that plaintiff had "never threatened to cut off [Arreola's] utilities or the store's utilities" and that plaintiff "never said he was acting on behalf of the City of Keizer in his conversations with [Arreola]." Plaintiff also submitted transcripts of Salmon's calls to plaintiff's supervisor and to 9-1-1, and excerpts from depositions of Salmon and the police officer who responded to the restaurant.

---

[1] As noted above, defendant also asserted a counterclaim for attorney fees, asserting that there was no objectively reasonable basis for plaintiff's claims. The trial court granted summary judgment in plaintiff's favor regarding that counterclaim. Defendant has not cross-appealed with respect to that ruling, and we do not address it further.

In response to plaintiff's motion for partial summary judgment on the tort claims, defendant argued that the record included evidence showing that (1) Salmon had not accused plaintiff of attempting to defraud the restaurant and (2) Salmon's statements that plaintiff had threatened Arreola were not false because they referred to a "veiled threat" that "Arreola should be concerned about her own utilities" that was clear to both Arreola and Salmon at the time. Defendant also asserted that plaintiff had failed to prove damages, as he had not offered evidence that Salmon's statements had caused plaintiff's termination. In support of its own summary judgment motion, defendant argued that plaintiff had not proved damages: "Plaintiff was fired because of his own actions, not the actions of defendants or anyone else. Because plaintiff cannot prove that his harm was caused by defendant, his claim fails as a matter of law * * *."

After a combined hearing on both motions, the trial court granted summary judgment in defendant's favor as to each of plaintiff's claims (defamation, defamation *per se*, and tortious interference with an employment relationship). The court ruled in defendant's favor on all three claims for a single reason: it concluded that the summary judgment record included no evidence that Salmon's false statements caused plaintiff's termination.

On appeal, plaintiff challenges both the trial court's ruling granting summary judgment to defendant and the trial court's ruling denying plaintiff's motion for partial summary judgment. *See Adair Homes*, 262 Or App at 276 ("In an appeal from a judgment involving cross-motions for summary judgment, both motions are subject to review if the parties have assigned error to the trial court's rulings on them.").[2] In doing so, he focuses on evidence that Salmon

---

[2] Plaintiff has not actually assigned error to the trial court's *rulings* on the parties' motions for summary judgment, as ORAP 5.45(3) requires, but has purported to assign error to the court's *reasoning* underlying its rulings on those motions. "However, because it is clear from the briefs, including the described standards of review and argument, that plaintiff intends to assign error to the trial court's rulings on summary judgment, we treat the assignments as having challenged those rulings." *Smith v. Bend Metropolitan Park and Recreation*, 247 Or App 187, 192 n 2, 268 P3d 789 (2011).

told plaintiff's supervisor and the 9-1-1 operator that defendant had tried to use a gift card that had no money on it, which was not true, and on defendant's admission that—contrary to what Salmon suggested to plaintiff's supervisor—plaintiff had never threatened to cut off Arreola's utilities. Plaintiff makes two arguments based on that evidence. First, plaintiff argues that the trial court erred in determining that the summary judgment record did not include evidence supporting plaintiff's claim that Salmon's allegedly defamatory comments had caused him to suffer economic damages. For that reason, plaintiff contends, the trial court erred by granting defendant summary judgment on his ordinary defamation and tortious-interference claims. Second, plaintiff argues that—even if the trial court was correct that plaintiff did not offer evidence of economic damages—the court erred in granting summary judgment to defendant on plaintiff's claim for defamation *per se* on that basis, as economic damages are not an element of that tort claim. We address the arguments in the order presented.

"Under Oregon law, a claim for defamation has three elements: '(1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm.'" *Neumann v. Liles*, 261 Or App 567, 575, 323 P3d 521 (2014) (quoting *National Union Fire Ins. Co. v. Starplex Corp.*, 220 Or App 560, 584, 188 P3d 332, *rev den*, 345 Or 317 (petitions of Scottsdale Ins. Co. and Starplex Corp.), *and rev den*, 345 Or 417 (petition of Nautilus Ins. Co.) (2008) (*National Union*). "Special harm" is "the loss of something having an economic or pecuniary value[.]" *National Union*, 220 Or App at 586 (citing *Restatement (Second) of Torts* § 575 comment b (1977)). A claim for tortious interference with an employment relationship similarly requires, among other things, proof of "a causal effect between the interference and damage to the economic relationship" and "damages." *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995) (describing the elements of the tort of intentional interference with economic relations). To establish the necessary causal link between defendant's allegedly tortious acts and the damages he allegedly suffered, plaintiff had the burden

of showing that the tortious acts were a substantial factor in bringing about the harm. *National Union*, 220 Or App at 586 (citing *Restatement* § 622A); *Benassi v. Georgia-Pacific*, 62 Or App 698, 705, 662 P2d 760, *rev den*, 295 Or 730 (1983) (similar).[3]

Here, plaintiff alleged damages consisting of "lost earnings and benefits in the amount of $250,000" with respect to his claims for ordinary defamation and tortious interference with employment relationship.[4] That is, plaintiff's claim for damages relates specifically, and solely, to his contention that he lost his job as a result of false statements by Salmon that plaintiff had tried to use a Little Caesars gift card with no value and, during the resulting dispute at the restaurant, had threatened to cut off Arreola's utilities. Thus, in assessing whether the trial court erred in granting summary judgment to defendant on the defamation and tortious-interference claims, we must determine whether the summary judgment record included evidence that created a genuine dispute of fact regarding whether Salmon's false statements were a substantial factor in the city's decision to terminate plaintiff from his job.

We begin by emphasizing what plaintiff does *not* argue. The city has asserted that it terminated plaintiff's employment because of his untruthfulness during the investigation into his actions at Little Caesars and the garage sale. Plaintiff does not dispute that assertion. Rather, he contends that the record includes evidence that the city would not have investigated him in the first place if not for Salmon's false statements. "By natural extension," he argues, "the false claims played a substantial role in his termination."

_____

[3] The cited cases discuss the "substantial factor" test only in conjunction with defamation claims. Plaintiff does not contend that a different causal test should apply to his tortious-interference claim; to the contrary, he states that, "[g]iven the similarities in the two theories, especially as applied in this case, the substantial factor test should also apply to a tortious interference claim." Given the parties' agreement on that point, we assume, without deciding, that plaintiff had the burden of proving that Salmon's allegedly defamatory statements were a substantial factor in the city's decision to discharge him, for purposes of both his defamation claim and his claim for tortious interference with an employment relationship.

[4] Plaintiff also alleged that he suffered $50,000 in general damages in association with his claim for defamation *per se*, which we discuss later in this opinion.

We disagree. Even assuming, for the sake of argument, that a jury could reasonably infer that Salmon made false statements to plaintiff's supervisor that prompted the city's investigation into plaintiff's conduct, that is not enough, standing alone, to establish that those statements were a substantial factor in the city's subsequent decision to terminate plaintiff's employment. That is, evidence that a defendant's false statements triggered an employer's investigation into an employee's conduct is not enough, by itself, to establish the defendant's liability for wages and benefits that the employee lost because the employer later fired the employee for different misconduct that was established by evidence *other than* the defendant's false statements.[5] The causal connection between the allegedly tortious acts and the later harm is simply too tenuous.

Plaintiff offers an additional theory about why the evidence of Salmon's falsehoods should have precluded summary judgment in defendant's favor on the defamation and tortious-interference claims. Noting that the city terminated plaintiff for being untruthful during the investigation, plaintiff contends that a jury could conclude that the city would not have considered his version of the Little Caesars events untruthful if Salmon had not falsely reported what had occurred. Again, we disagree. In support of its cross-motion for summary judgment, defendant submitted the letter in which the city informed plaintiff that it was terminating his employment, along with a 17-page memorandum referenced in that letter, in which the city's public works director set out his reasons for recommending that action. That memorandum outlines the city's investigation and provides detailed descriptions of interviews with Arreola, plaintiff, and the police officer who was dispatched to Little Caesars, as well as interviews with witnesses to the unrelated garage-sale incident. The memorandum goes on to explain the director's conclusion that plaintiff had made "numerous misrepresentations in an effort to minimize the seriousness of his conduct and place it as occurring during

---

[5] As we discuss in more detail below, defendant submitted uncontradicted evidence that the city terminated plaintiff's employment because he was untruthful during the investigation, and *not* because of the allegations that Salmon made in the challenged statements.

his lunch breaks." In that regard, the memorandum identifies several misrepresentations related to the incidents at Little Caesars and the garage sale. Most of those misrepresentations have no possible relationship to Salmon's false statements to plaintiff's supervisor and the 9-1-1 operator, as they relate to matters like plaintiff's untrue claims that he dealt with the gift-card issue over his lunch hour and that he made a long-distance call to the Little Caesars corporate headquarters from his home (in fact, he made the call using the city's phone system), as well as plaintiff having falsified his time sheet. Only one of the identified misrepresentations potentially could relate at all to Salmon's false statements: the director's determination that plaintiff "was not truthful when he described the substance of his interactions with the Manager of [Little Caesars]." But even in that regard, the memorandum's discussion of plaintiff's untruthfulness does not mention Salmon's accusations that plaintiff had threatened to shut off Arreola's utilities and had tried to use a gift card with a zero balance on it; rather, it relates only to other details of plaintiff's encounter with Arreola, as described by her and the responding officer.

In response to the evidence that the city found him untruthful for reasons unrelated to Salmon's false statements, plaintiff cites no contradictory evidence. Rather, he just points to the existence of those statements and the city's later conclusion, after an extensive investigation, that plaintiff had been untruthful during that investigation. We reject plaintiff's contention that a jury could infer, simply from the evidence that Salmon made false statements, that those statements were a "substantial factor" in the city's decision to terminate plaintiff's employment because he had been untruthful. Only speculation, not reasonable inference, could lead to such a conclusion. Consequently, the trial court did not err when it granted summary judgment to defendant on plaintiff's defamation and tortious-interference claims on the ground that plaintiff had not submitted evidence creating a genuine dispute regarding whether defendant's allegedly tortious acts caused him special harm, *i.e.*, the loss of wages and benefits from his city job.

We turn to plaintiff's argument that the trial court erred in granting defendant summary judgment on plaintiff's claim for defamation *per se*. That tort shares two elements in common with an ordinary defamation claim: "(1) the making of a defamatory statement" and "(2) publication of the defamatory material." *National Union*, 220 Or App at 584. However, a plaintiff who claims defamation *per se* need not prove the "special harm" that is an element of an ordinary defamation claim. *Id.* Instead, the plaintiff must prove that the defendant published a certain type of defamatory statement that is deemed to be *per se* harmful, for example, statements that are "'likely to lead people to question [a] plaintiff's fitness to perform his job,'" *Neumann*, 261 Or App at 576 (quoting *L & D of Oregon, Inc. v. American States Ins. Co.*, 171 Or App 17, 25, 14 P3d 617 (2000)) (brackets in *Neumann*), that "cast aspersions on the plaintiff's ability to perform essential [job] functions," that "assert that the plaintiff lacks a characteristic necessary to successful performance[] of his or her job," or that include "imputations of moral turpitude." *National Union*, 220 Or App at 584-85, 584 n 6.

Plaintiff contends that the trial court erred in this case by granting summary judgment to defendant on the defamation *per se* claim on the ground that plaintiff had not proved special harm. Defendant concedes the point. The parties are correct. The trial court erred in granting summary judgment to defendant on the defamation *per se* claim on the same ground—absence of proof of special harm—on which it granted summary judgment to defendant on plaintiff's other tort claims. *See National Union*, 220 Or App at 584 (special harm is not an element of a claim for defamation *per se*).

Nonetheless, defendant argues that we can affirm the trial court's judgment on the ground that Salmon's statements were subject to a qualified privilege because they related to plaintiff's misconduct as a city employee and they were made to government authorities who may be "expected to take official action." *See Demers v. Meuret*, 266 Or 252, 255-56, 512 P2d 1348 (1973) ("'[C]ommunications made to those who may be expected to take official action of some

kind for the protection of some interest of the public' are protected by a qualified \* \* \* privilege." (Quoting William L. Prosser, *Law of Torts* 791 (4th ed 1971).)). Defendant argues that, although a qualified privilege may be abused, and therefore lost, if a defamatory statement is made with "malice," *Christianson v. State of Oregon*, 239 Or App 451, 459, 244 P3d 904 (2010), *rev den*, 350 Or 297 (2011), plaintiff had the burden of producing evidence that defendant had abused the privilege in this case. Moreover, defendant contends, plaintiff did not do so. Defendant concludes that, because plaintiff produced no evidence that Salmon's statements were made with malice, we should affirm the trial court's judgment in defendant's favor.

We decline to affirm the judgment on that "right for the wrong reason" basis. We can affirm a trial court's ultimate ruling on a basis other than the one that the court articulated only if certain conditions are met, including that "the evidentiary record \* \* \* be sufficient to support the proffered alternative basis for affirmance." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659, 20 P3d 180 (2001).

> "That requires: (1) that the facts of record be sufficient to support the alternative basis for affirmance; (2) that the trial court's ruling be consistent with the view of the evidence under the alternative basis for affirmance; and (3) that the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below. In other words, even if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a different record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance."

*Id.* at 659-60 (emphasis omitted).

In moving for summary judgment, defendant did not present the trial court with the privilege argument that it makes on appeal.[6] Had it done so, plaintiff might have

---

[6] Indeed, it is not clear that the privilege argument that defendant makes on appeal invokes the same privilege as those that it referenced in the affirmative defenses included in its answer to plaintiff's complaint.

put on evidence that Salmon made his statements with malice or that the claimed privilege otherwise did not apply or had been lost through abuse. Plaintiff had no reason to do so unless and until defendant put the privilege question at issue in its summary judgment motion. *See* ORCP 47 C (adverse party to a summary judgment motion "has the burden of producing evidence on any issue *raised in the motion* as to which the adverse party would have the burden of persuasion at trial" (emphasis added)); *Davis v. County of Clackamas*, 205 Or App 387, 393-94, 134 P3d 1090, *rev den*, 341 Or 244 (2006) (a plaintiff opposing a defendant's summary judgment motion has the burden to offer evidence creating a genuine issue of material fact regarding causation "once defendants put that element of plaintiff's case in issue"). Because the summary judgment record might have developed differently had defendant argued to the trial court that it was entitled to judgment on the basis that Salmon's statements were privileged, we will not affirm on that alternative basis.

Defendant also makes a second "right for the wrong reason" argument, asserting that we should affirm summary judgment in its favor to the extent that plaintiff's defamation *per se* claim is based on Salmon's accusation that plaintiff was trying to use a gift card with no value. According to defendant, that accusation simply gave rise to a "consumer dispute" and not, as a matter of law, a crime involving moral turpitude. At least in the context of this case, we disagree. A jury could infer, from the nature of Salmon's statements about plaintiff's remarks about the gift card and the context in which Salmon made those statements, that he was accusing plaintiff of a crime—theft—that involved deceit. That is enough to withstand a motion for summary judgment on the claim for defamation *per se*. *Muresan v. Philadelphia Romanian Pentecostal Church*, 154 Or App 465, 473-74, 962 P2d 711, *rev den*, 327 Or 621 (1998).

To recap our holdings so far: the trial court erred when it granted summary judgment in defendant's favor on plaintiff's claim for defamation *per se*, but correctly granted summary judgment to defendant on plaintiff's claims for ordinary defamation and tortious interference with an employment relationship.

We turn to plaintiff's contention that the trial court should have granted *him* summary judgment on his claim for defamation *per se*. In assessing that argument, we consider the evidence in the light most favorable to defendant to determine whether there is a genuine dispute of material fact and whether plaintiff was entitled to judgment as a matter of law. *Adair Homes*, 262 Or App at 276.

Again, plaintiff focuses on Salmon's statements suggesting that plaintiff had threatened to shut off Arreola's utilities and that he had tried to use a gift card with no value. As explained above, to prove a claim for defamation *per se*, plaintiff had the burden of proving that defendant made a false statement, published to a third party, that—as pertinent here—either (1) tended to injure plaintiff in his profession or business; or (2) imputed to plaintiff the commission of a crime involving moral turpitude. *Marleau v. Truck Insurance Exchange*, 333 Or 82, 95, 37 P3d 148 (2001). Accordingly, our task is to view the evidence in the light most favorable to defendant to determine whether a reasonable factfinder could determine that Salmon did *not* publish false statements that impugned plaintiff in his profession or that accused him of a crime of moral turpitude. *See Affolter v. Baugh Construction Oregon, Inc.*, 183 Or App 198, 203 n 2, 51 P3d 642 (2002) (whether a statement "was capable of a defamatory meaning" is a question of law; whether the statement actually "was defamatory presents a factual issue to be determined by the factfinder").

Applying that standard of review, we conclude that genuine issues of material fact exist as to whether the statements at issue were defamatory *per se*. The record includes plaintiff's admissions that he asked whether Arreola lived in Keizer and that he told Arreola that she could "look him up." The record also includes evidence that plaintiff was driving a city vehicle and wearing city identification during his interactions with Arreola, that he had been at the Keizer restaurant a few days before the gift-card interaction to work on a water line, at a time when Arreola was present, that he was upset and raised his voice during his interactions with Arreola, that he repeatedly referred to his position with the city during those interactions, and that Arreola interpreted plaintiff's question about where she

lived as a threat. A factfinder could infer from that evidence that a listener would have reasonably understood plaintiff to be implicitly threatening to interfere with Arreola's utility service, even though plaintiff did not make such a threat expressly. Similarly, although a jury *could* infer that Salmon's statements about the gift-card incident implied that plaintiff was attempting to commit theft, a jury could also infer that no such message was conveyed. Thus, the evidence creates genuine issues of material fact regarding the extent to which Salmon's statements were untrue or otherwise defamatory and, consequently, whether defendant committed defamation *per se*. Accordingly, the trial court did not err when it denied plaintiff's motion for partial summary judgment with respect to defendant's liability for that tort.

Judgment on plaintiff's claim for defamation *per se* reversed and remanded; otherwise affirmed.